PITTSBURGH CONST. CO. v. WEST SIDE BELT R. CO. et al.

(Circuit Court, W. D. Pennsylvania. February 13, 1907.)

No. 30.

1. CORPORATIONS—CONTRACT MADE BY FOREIGN CORPORATION IN VIOLATION OF STATUTE—LEGALITY.

Under the Pennsylvania statute of 1874, which makes it unlawful for any foreign corporation to do any business in the state until it shall have registered and complied with certain other requirements, a contract entered into in the state of Pennsylvania by a foreign corporation which had not at the time complied with such statute to construct a railroad within the state is illegal and void, and no action can be maintained thereon, either against the other party or a guarantor, to recover the contract price of work done thereunder, although the corporation complied with the statute prior to the doing of the work.

2. CONTRACTS—EFFECT OF ILLEGALITY—WAIVER.

Where a contract when made is illegal as in violation of a statute, the illegality cannot be waived, nor can a party be estopped to set it up as a defense to an action on such contract by having received the benefit thereof or by part performance.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, §§ 681–700.]

3. ARBITRATION AND AWARD—ACTION ON AWARD—ILLEGALITY OF CONTRACT.

An arbitration award made under authority contained in an illegal contract will not be enforced by the courts.

At Law. On motion for judgment non obstante veredicto.

Reed, Smith, Shaw & Beal, for plaintiff.

Willis McCook and Lee & Mackey, for defendant.

BUFFINGTON, Circuit Judge. This is an action of assumpsit brought by the Pittsburgh Construction Company, a corporation of the state of West Virginia, against the West Side Belt Railroad Company, a corporation of Pennsylvania, designated in this opinion as the "Belt Road," and John S. Scully and Theodore N. Barnsdall, citizens of said state.

The Belt Road on April 17, 1901, entered into a written contract with A. S. Petrie to construct its proposed line of railway. On April 25, 1901, it authorized Petrie to sublet this contract to the plaintiff company, which company was chartered in West Virginia May 14, 1901. On May 24, 1901, Petrie made a new contract with the plaintiff (which was substantially a duplicate of his contract), a copy of which first contract is embodied in the statement of claim as Exhibit A. Contemporaneously with the execution thereof defendants, by indorsement thereon, stipulated:

"For value received, the West Side Belt Railroad Company and John S. Scully and Theodore N. Barnsdall do hereby guarantee and become surety for the payment of the money mentioned in the within contract as the same becomes due and payable. In witness whereof the said West Side Belt Railroad Company has hereunto set its common corporate seal, by the hand of its president, attested by its secretary, and the said John S. Scully and T. N. Barnsdall have hereunto set their hands and seals this 24th day of May, A. D. 1901."

Thereafter the plaintiff proceeded under said contract, and about June, 1903, turned over the road to the Belt Road in pursuance of the notice following:

"In reply to your letter of June 11th, will say that we will accept the work as completed. We do not intend to make any reduction for imperfect ditching. We do not, however, mean by this acceptance of the work to waive any claim we may have for damage resulting from any violation of the contract with you. We therefore ask you to remove at once all of your engines, plant, and equipment from the railroad tracks, as they greatly interfere with the operation of the road. And we further notify you that any movement of your trains or engines on our tracks from this date must be with the consent and under the direction of our superintendent, Mr. C. V. Wood. Otherwise, we will hold you liable to any damages resulting from collision or interruption or delay of our traffic."

Petrie, who made the original contract, was not a contractor. It was never intended he should build the road, or was the contract given to him for that purpose. He was an officer of the Belt Road, who resigned to qualify him to take the contract, and become the conduit through whom the contract could be sublet to the plaintiff company, and through whom a portion of the proposed price of construction was, through the agency of Barnsdall and Scully, to be returned to all the stockholders of the Belt Road. The contract of Petrie with the plaintiff seems, therefore, to have been treated as between plaintiff and the Belt Road.

After the construction of the Belt Road its chief engineer sent the following notice to the plaintiff:

"I have about completed the final estimate for your work under your contract with the West Side Belt Railroad Company, and as chief engineer mentioned in the contract, to whom has been committed the final decision of all disputes between the parties, before finally submitting the estimate to you, I wish to notify you that the railroad company claims of me a deduction or credit on the final estimate of the damages sustained by the railroad company owing to the delay in the completion of the contract. If you wish to be heard on this question, I will meet your representatives and the representatives of the railroad company at my office in the Farmers' Bank Building on Monday, September 21st, at 10 o'clock a. m.; or, if this may be inconvenient to you, upon your suggestion I will try and fix a date and place that will suit your convenience. Please let me know what your wishes are in the matter."

Under this notice a large amount of testimony was taken; the Belt Road and plaintiff being each represented by counsel. Later notice was given to Scully and Barnsdall by the following notice:

"To A. S. Petrie, Pittsburgh Construction Company, West Side Belt Railroad Company, John S. Scully, T. N. Barnsdall, J. C. Bower, McCleave & Wendt and Reed, Smith, Shaw & Beal: You are hereby notified that upon Monday, January 16, 1905, at 10 o'clock a. m., at my office, Room 2107, Farmers' Bank Building, Pittsburgh, Pa., I will hold a final meeting under the provisions of the clause of the article of agreement dated the 24th day of May, 1901, between the Pittsburgh Construction Company of the first part and A. S. Petrie of the second part, which clause reads as follows, viz.: 'And it is mutually agreed and distinctly understood that the decision of the chief engineer shall be final and conclusive in any dispute which may arise between the parties to this agreement relating to or touching the same, and each and every of said parties do hereby waive any right of action, suit or suits, or other remedy in law, or otherwise, by virtue of said covenants, so that the decision of the said chief engineer, James H. McRoberts, shall in the nature of an award be final and conclusive on the rights and claims of said parties.' You are requested to be present at this meeting if you see fit."

There is a dispute as to whether Scully and Barnsdall took any part in the proceedings. There is no question, however, they had notice, and that counsel for them requested an opportunity to examine the testimony, and thereafter made no request for further hearing and made no protest. On October 24, 1905, McRoberts made a report or award in which "he finds the bills and claims of the Pittsburgh Construction Company, subcontractor, to amount to $972,112.25, itemized as follows: Final estimate $610,321.65; force and extra work $361,790.60—$972.112.25. Of this account, as rendered, your arbiter has rejected $98,623.64 as excessive, irrelevant, and unjust, leaving $873,488.61 in favor of the subcontractor. Of this amount your arbiter finds $540,737.63 as having been paid by the West Side Belt Railroad Company, on account, as surety for Petrie, the contractor, leaving as against Petrie $332,750.98, which will become due and payable as of this date."

This suit is brought against Petrie's guarantors to recover said sum of $332,750.98, and a verdict for such amount, with interest, was taken for the plaintiff. Thereupon defendants move for judgment in their favor non obstante veredicto. The grounds of this motion are, first, that this suit cannot be maintained because the plaintiff, a foreign corporation, did not register, as required by Pennsylvania statute, before making the contract on which this suit is based; and, secondly, that the alleged award is invalid because the arbiter failed to pass and report on the claim of the railroad for $96,970.86 for delay in completing the work; and, lastly, the arbiter having found that "almost every provision of the agreements between the parties had been disregarded, neglected or violated, by both parties, and, in consequence, waived," the sureties are released.

Taking up the first question, it is proper to defendants to say that, while they deny liability under the contract by reason of plaintiff's nonregistration, they do not deny that in a proper proceeding the railroad company, which is financially responsible, is answerable for just compensation to the plaintiff. In that regard their brief says: "Where work is done under such a contract, recovery can be had on the quantum meruit, and not on the contract."

Turning first to the statutes, we have the act of 1874 which provides:

"From and after the passage of this act, no foreign corporation shall do any business in this commonwealth until said corporation shall have established an office, or offices, and appoint an agent, or agents, for the transaction of its business therein. It shall not be lawful for any such corporation to do any business in this commonwealth, until it shall have filed in the office of the Secretary of the Commonwealth a statement under the seal of said corporation, and signed by the president or secretary thereof, showing the title and object of said corporation, the location of its office or offices, and the name or names of its authorized agent or agents therein; and the certificate of the Secretary of the Commonwealth under the seal of the commonwealth, of the filing of such statement, shall be preserved for public inspection by each of said agents in each and every of such offices. And person or persons, agent, officer or employé of any such foreign corporation, who shall transact any business within this commonwealth for any such foreign corporation, without the provisions of this act being complied with, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by imprisonment not exceeding thirty days, and by fine not exceeding one thousand dollars, or either, at the discretion of the court trying the same."

Also the ninteenth section of the act of 1889 (P. L. 420), which provides:

"That hereafter no limited partnership, bank, joint-stock association, association, corporation or company whatsoever, formed, erected, incorporated or organized, by or under any law of this commonwealth, general or special, or formed, erected, incorporated or organized under the laws of any other state, and doing business in this commonwealth, shall go into operation, without first having the name of the institution or company, the date of incorporation or organization, the act of assembly or authority under which formed, incorporated or organized, the place of business, the post office address, the names of the president, chairman, secretary and treasurer or cashier, and the amount of capital authorized by its charter and the amount of capital paid into the treasury, registered in the office of the Auditor General; and every limited partnership, bank, association, joint-stock association, company or corporation whatsoever, now engaged in business in this commonwealth, shall within ninety days after the passage of this act, register as herein required in the office of the Auditor General; all the corporations, companies, associations and limited partnerships aforesaid, shall annually hereafter notify the Auditor General of any change in their officers; and, any such institution or company which shall neglect or refuse to comply with the provisions of this section, shall be subject to a penalty of five hundred dollars, which penalty shall be collected on an account settled by the Auditor General and State Treasurer in the same manner as taxes on capital stock are settled and collected."

The contract here involved between Petrie and the plaintiff was made May 24, 1901. The plaintiff had not then registered. It subsequently did register on June 15, 1901.

Permission to a foreign corporation to transact business in a state is a subject of state legislation, when exercised within reasonable limits, and, where the highest courts of a state have construed a statute granting such permission, the federal courts follow such construction. McCanna Co. v. Citizens' Co., 76 Fed. 420, 24 C. C. A. 11, 35 L. R. A. 236. Now, in Lasher v. Stimson, 145 Pa. 30, 23 Atl. 552, in speaking of the requirement of registration of the act of 1874, the Supreme Court of Pennsylvania held:

"These terms are not onerous or in conflict with any constitutional provision or rule of public policy. But they are clearly prohibitory, and they indelibly stamp as unlawful any business transaction within the state by a foreign corporation which has not complied with them. It is only by its observance of them that it can have a legal existence for business purposes within this jurisdiction, or acquire contractual rights which our courts will recognize."

This decision was made in 1891, and was the declared law of the states when the contract between Petrie and plaintiff was made in 1901. The decision in Delaware, etc., Co. v. Passenger Railway Company, 204 Pa. 25, 53 Atl. 533, followed in 1902. This decision shows adherence by the Supreme Court to the construction originally given the act in Lasher v. Stimson, supra, and holds that:

"The purpose of the act is to bring foreign corporations doing business in this state within the reach of legal process. This purpose is not accomplished by a registration of the corporation at the pleasure of its officers, or when it may be to their interest to appeal to our courts. The act is for the protection of those with whom it does business, or to whom it may incur liability by its wrongful acts; and nothing short of a registration before the contract that it seeks to enforce is made can give it a right of action. Any other construction of the act would violate its plain words and wholly defeat its object by affording protection to the corporation and denying it to the public."

Now, on May 24, 1901, when the plaintiff, a foreign corporation, made this contract it had not registered. It therefore had no right under the statute to make it, and in doing so its officers and agents made themselves liable to a criminal prosecution with fine and imprisonment. It will also be observed that the purpose of the contract was to bind the corporation to do a large amount of unlawful work in the commonwealth. A contract thus made in violation of law, and whose purpose was to procure further violations of law, will not be enforced by the courts. In Johnson v. Hulings, 103 Pa. 501, 49 Am. Rep. 131, plaintiff had sold land, and pursuant to contract was entitled to $10,000 commissions. This the jury awarded him. He had not taken out a broker's license. The Supreme Court said:

"Such being the case, the plaintiff was, by virtue of the eighteenth section of the act of the 10th of April, 1849 [P. L. 573], brought within the provisions of the act of May 27, 1841 [P. L. 396], and was subject to the penalty therein prescribed in case of a violation of those provisions. The result follows that Johnson, in the transaction in hand, stands in the position of a real estate broker who seeks to enforce a contract which, under the statute, he had no right to make, and by the making of which he subjected himself to the penalty imposed by that statute. But a contract such as this, opposed as it is alike to good morals and public policy, cannot be enforced. That has been ruled times without number. * * * If, then, the business itself be unlawful, the commissions or gains arising from it without regard to the form of the contract for their payment are also unlawful."

If, then, the contract between Petrie and the plaintiff was illegal and intended to secure the performance by the plaintiff of unlawful acts, how can this action on the guaranty given by the defendants be enforced? That guaranty was an undertaking on their part to pay to the plaintiff the consideration for doing the unlawful things provided for in the contract. It is clear that an action on the guaranty cannot be sustained without disclosing the guarantied contract; for performance of its prohibited acts is the foundation of recovery against the guarantors. Now, "the test whether a demand connected with an illegal transaction can be enforced at law is whether the plaintiff requires the aid of the illegal transaction to establish his case." Johnson v. Hulings, supra. This is in accord with McMullen v. Hoffman, 174 U. S. 654, 19 Sup. Ct. 839, 43 L. Ed. 1117, where it is said:

"The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way toward carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract."

This objection of invalidity and illegality may sound very ill coming from a party who on his part enjoyed the fruit of the contract; "but," as is said in Thorne v. Travellers' Insurance Co., 80 Pa. 29, 21 Am. Rep. 89, "it is not for his sake the objection is allowed. It is founded on general principles of policy which he shall have the advantage of, contrary to the real justice between the parties. The principle of public policy is that no court will lend its aid to a party who grounds his

151 F.—9

action upon an immoral or an illegal act." To the same effect is the holding of this court in Pittsburgh Dredging Company v. Mononga-hela Company (C. C.) 139 Fed. 780, where it is said:

"It will be observed that, when the law refuses to be used to enforce an unlawful contract, it is not done to benefit or aid the party who has profited by the wrong, and who is in possession of the fruits of the fraud, but on the higher ground of public policy."

We are clear, also, that the subsequent work under the contract, the estimate made by the engineer at the suggestion of the railroad, and the arbitration would not change the status of the contract. Once tainted with illegality there can be no cure so far as the contract is concerned. Such is the holding in Coppell v. Hall, 7 Wall. 558, 19 L. Ed. 244:

"In such cases there can be no waiver. The defense is allowed, not for the sake of the defendant, but of the law itself. The principle is indispensable to the purity of its administration. It will not enforce what it has forbidden and denounced. The maxim, 'Ex dolo malo non oritur actio,' is limited by no such qualification. The proposition to the contrary strikes us as hardly worthy of serious refutation. Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is that the law will not lend its support to a claim founded upon its violation."

Nor does the award of the engineer have any efficacy in this case. Authority on his part to act and the obligation of parties to abide by his decision rests in both cases on the provision of a contract which is contra legem. The law will not enforce an award based on an illegal contract. Benton v. Singleton, 114 Ga. 548, 40 S. E. 811.

Upon the whole, therefore, we are of opinion that by reason of the nonregistration of the plaintiff corporation prior to the contract here involved the verdict for plaintiff cannot be sustained. Judgment will therefore be entered in favor of the defendant non obstante veredicto; but said judgment shall not bar any subsequent suit or proceeding by the plaintiff for services performed.