PITTSBURGH DREDGING & CONSTRUCTION CO. v. MONONGAHELA & WESTERN DREDGING CO.

(Circuit Court, W. D. Pennsylvania. July 21, 1905.)

No. 19.

CONTRACTS—CONSPIRACY TO DEFRAUD—PUBLIC POLICY—VALIDITY.

Where, prior to bidding on certain private work, plaintiff and defendant contracted that defendant should bid $1.60 and plaintiff $1.70 per cubic yard for the work required, and whichever party received the contract was to give the other one-half of the work, and, after both bids were rejected, and a change made in the requirements, defendant filed an additional bid of $1.25, which was accepted, and, though plaintiff tendered performance of one-half of the contract, defendant did the work at a cost of 9 cents per cubic yard, the contract between plaintiff and defendant constituted a conspiracy to defraud the person letting the contract, and was void between the parties, as against public policy.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, § 661.]

Sur Motion for Judgment on Questions Reserved.

Seymour, Patterson & Seibeneck, for plaintiff.
Reed, Smith, Shaw & Beal, for defendant.

BUFFINGTON, District Judge. This is a motion to enter judgment on reserved points in a suit by the Pittsburgh Dredging & Construction Company against the Monongahela & Western Dredging Company, brought to recover one-half the profits earned by defendant on certain dredging done by it. The facts established by the verdict or uncontroverted in the proofs are these: In June, 1904, the Jones & Laughlin Steel Company were required by the United States engineer in charge of the Monongahela river to remove a large body of slag from the shore bed of that stream. In pursuance of this requirement the steel company requested bids from the plaintiff and defendant dredging companies. Thereupon these

companies entered into an agreement, followed by a written contract, whereby defendant was to bid $1.60 and plaintiff $1.70 per cubic yard for the dredging required by the government, and, whichever party received the contract, each was to have one-half the work. Bids were made accordingly, the plaintiff's netting from $4,500 to $5,000 in excess of defendant's. The defendant alleged these bids were rejected, that the requirements of the government engineer were changed, and thereupon it bid $1.25 on the changed requirements. It contended this bid was for another and different requirement from that contemplated by the contract, and its bid was not covered by such contract. The finding of the jury, however, established the fact that the bid of the defendant and the work awarded were embraced by the contract referred to, and that the plaintiff tendered performance of one-half thereof. The proofs show the work was actually done by defendant at a cost of 9 cents per cubic yard. The Jones & Laughlin Company knew nothing of the contract between these parties until the work was finished. On the trial a verdict was rendered in favor of the plaintiff for $3,439.50, subject to the questions involved in the defendant's fifth and sixth points, which were, respectively: "That the agreement of June 16, 1904, constituted a conspiracy to defraud the Jones & Laughlin Steel Company, and was illegal and void, and no action can be maintained thereon, and the verdict must be for the defendant;" and "that the agreement of June 16, 1904, constituted a combination in restraint of trade, and was illegal and void, and no action can be maintained thereon, and the verdict must be for the defendant." The defendant now moves for judgment thereon.

From the terms of the contract, the fact that it was not disclosed to the Jones & Laughlin Company, and the uncontradicted testimony proved on the part of the plaintiff by Smoot, one of the defendant's officers, who says, "Well, the defendant and the plaintiff —we had a meeting, and we decided we could fix this thing up and make some money out of it, and get a pretty good price, and we made prices on it," it is clear that the purpose of the contract was to mislead the steel company into the belief there was competitive bidding between the two companies, and by this collusive bidding secure the contract for their joint benefit. The plaintiff, then, being driven to the necessity of showing such a contract as the foundation of its right to recover, will the law lend its aid to enforce such an agreement? The answer to this turns on the question whether this is an illegal contract, for, as Lord Kenyon said, "It is a maxim in our law that a plaintiff must show he stands on fair ground when he calls a court of justice to administer relief to him," and to the same effect is the holding of the Supreme Court in McMullen v. Hoffman, 174 U. S. 654, 19 Sup. Ct. 845, 43 L. Ed. 1117, namely: "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged right directly springing from such contract." It will be observed that when the law refuses to be used to en-

force an unlawful contract it is not done to benefit or aid the party who has profited by the wrong, and who is in possession of the fruits of the fraud, but on the higher ground of public policy. This may result in a wrongdoer profiting by his own wrong, but to transfer the money to the other wrongdoer would equally enable that other to profit by his unlawful act. But assuredly the party who is thus left remediless cannot justly complain, for if, for the purposes of legal relief, the parties are without remedy, they have outlawed themselves, and the law wisely holds aloof, and leaves without its aid those whose deliberate purpose was to transgress its provisions. Nor is it necessary that the objectionable contract actually perpetrate a fraud, or that any wrong should have been done to any one. It is the nature and object of the contract, apart from the fact, whether wrong actually from it results, that bars its enforcement. "The law looks to the general tendency of such contracts. The vice is in the nature of the contract, and it is condemned as belonging to a class which the law will not tolerate. * * * The vice is inherent in contracts of this kind, and its existence does not in the least depend upon the success which attends the execution of any particular agreement." McMullen v. Hoffman, supra.

Such being the attitude of the law toward the enforcement of illegal contracts generally, we next inquire whether the one here involved was against public policy, and therefore illegal. The purpose of this contract, as stated above, being to create a false appearance of competitive bidding, and by collusive tenders to secure a contract for the joint benefit of the participants, is such a contract against public policy? How such collusive bids stand in the estimate of the Supreme Court is clear. In McMullen v. Hoffman, supra—an agreement for collusive bidding by two bidders for their joint benefit—it was said:

"Upon these facts the question arising is whether a contract between the parties themselves, such as is above set forth, is illegal. In order to answer. the question, we would first naturally ask what is its direct and necessary tendency? Most clearly that it tends to induce the belief that there is really competition between the parties making the different bids, although the truth is that there is no such competition, and that they are in fact united in interest. It would also tend to the belief on the part of the committee receiving the bids that a bona fide bidder, seeking to obtain the contract, regarded the price he named, although much higher than the lowest bid, as a fair one for the purpose of enabling him to realize reasonable profits from its performance. A bid thus made amounts to a representation that the sum bid is not in truth an unreasonable or too great a sum for the work to be done. We do not mean it is a warranty to that effect, or anything of the kind, but simply that a committee receiving such a bid and assuming it to be a bona fide bid would naturally regard it as a representation that the work to be done, with a fair profit, would, in the opinion of the bidder, cost the amount bid. Hence it would almost certainly tend to the belief that the lower bid was not an unreasonably high one, and that it would be unnecessary and improper to reject all the bids and advertise for a new letting. * * * It might readily be surmised that, if these parties had bid in competition, one or both of the bids would have been lower than their combined bid. It was not necessary, however, to prove so difficult a fact. The inference would be natural. * * * But in this case there is more, even, than concealment. There is the active fraud in the putting in of these, in substance fictitious, bids, in their different names, but in truth forming no competitive bids, and put in for the purpose

already stated. It is not too much to say that the most perfect good faith is called for on the part of bidders at these public lettings, so far as concerns their position relating to the bids put in by them or in their interest. The making of fictitious bids under the circumstances detailed herein is, in its essence, an illegal and most improper act; indeed, it is a plain fraud, perpetrated in the effort to obtain the desired result."

And in Hyer v. Richmond Traction Company, 168 U. S. 471, 18 Sup. Ct. 114, 42 L. Ed. 547, referring to the agreement in that case, which was for two rival parties to unite (with the full knowledge of the municipal authorities) in procuring the grant of a franchise for their joint benefit, it was said:

"The vice which is so frequently detected in contracts and agreements of a similar nature lies in the fact of secrecy, concealment, and deception. The one applicant, though apparently antagonizing the other, is really supporting the latter's application; and the public authorities are misled by statements and representations coming from a supposed adverse but in fact friendly source."

Now, such being the declared law of the land, why should it not be extended to the case in hand? Because, it is argued, the letting involved in the case cited, and in others that might be, were of public works, and the rule does not apply in private lettings. In the absence of any adjudged case binding on this court compelling us to restrict this wholesome principle of public policy to any such narrow limit, we are unwilling to do so. That such secret, collusive biddings tend, or may tend, to mislead public officials, is conceded. But are they resorted to in private lettings for any other than a like purpose to deceive, or are they any less harmful in effect? It is true the personal interest of the individual, as contrasted with the impersonal interest of the public official, may lead the former to detect more readily the collusive character of the bid; but, as we will see, the vice of the device consists not in the success of the plan, but in the character of the contract; and in both lettings, whether they be public or private, that vice is the purpose to mislead and deceive. "In all cases where contracts are claimed to be void as against public policy, it matters not that any particular contract is free from any taint of actual fraud, oppression, or corruption. The law looks to the general tendency of such contracts. The vice is in the very nature of the contract, and it is condemned as belonging to a class which the law will not tolerate." Richardson v. Crandall, 48 N. Y. 348, cited approvingly in McMullen v. Hoffman, supra. Indeed, the case in hand illustrates that there may be cases where the private letting requires the protective shield of the law equally, if not, indeed, more than the public one. If, for example, the government had in this case called for bids to remove this slag, and the two dredging companies here concerned had entered into this agreement to make collusive bids and for a division of profits, and the contract had been awarded one of them, it is clear the law would not enforce rights based on such a contract. If, however, the government, instead of itself removing the slag, required the company that placed it there to do so, and that company is met by the same collusive contract by the same bidders, we see

no ground for alleging the combination was a whit different in purpose or effect in the two cases. Indeed, if anything, it would seem the obligation to protect was even greater in the private letting; for while in the letting by the government it was under no pressure to remove, and could therefore refrain from accepting any bid, the private letter was under stress to act, and by reason of that fact the bidders, by their combination, had a correspondingly greater lever to accomplish their purpose to exact any price they saw fit to collusively bid. In Ray v. Mackin, 100 Ill. 246, we find the protection of public policy was afforded a private letting. While the bidding in that case was for paving a public street, the work was done by the property owners; the entire transaction was with them, and not with the municipality. The facts were that seven-eighths of the lot owners along a street could, by virtue of the provisions of an ordinance, make a private contract to pave it. A number of the lot owners had signed an agreement with Ray & Whitney, a contracting firm. That firm then agreed with Mackin, another contractor, to assist him in getting the contract, turn over their signers to him, and bid on the work at a higher price. Mackin agreed to pay them a part of the profits. A committee of the lot owners having been appointed to receive bids, bids were made by Mackin, and a higher one by Ray & Whitney. The former was awarded the contract. When Ray & Whitney brought suit for their share of the profits on their contract with Mackin, which provided for payment of $1,500 of profits "under a private contract made with the property owners on the said avenue, they agreeing to assist me in obtaining the work, to the best of their ability; the money to be paid to Ray & Whitney from time to time as the profit on the work is collected," it was held the contract "was clearly against public policy, and a fraud upon the persons who were to pay for the improvement of the street." Put into plain language, the purpose of the contract sued on in this case was to make collusive bids, to mislead the letter into a belief that there were competitive bids, and induce an award of the work on that false assumption. That was the purpose and spirit of the contract—the end sought. If the law approves of such an object, it should enforce it; if it disapproves, it should refuse to lend itself to be used to enforce measures it disapproves. When the law which now avails itself of public policy to protect public lettings from collusive biddings finds like obnoxious practices with like deceptive ends in view threaten the integrity of private lettings, we think it would be lacking in virility and progress did it not keep abreast of conditions, and apply this salutary principle, where the mischief exists, to all lettings alike. Viewed from the standpoint of morals, square dealing, and commercial integrity, combinations for collusive, misleading biddings, wherever made, cannot be approved; yet to enforce rights based on an agreement to make such bids is to make the law an active agent to accomplish such deceptive purposes. In view of this result, we think the law should adjudge such agreements void on the broad ground of public policy, and accordingly, on the question reserved,

viz., "that the agreement of June 16, 1904, constituted a conspiracy to defraud the Jones .& Laughlin Steel Company, and was illegal and void, and no action can be maintained thereon, and the verdict must be for the defendant," we direct the entry of judgment for the defendant. This view renders needless a discussion of the other reserved point.