

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-23-2001

# Allied Erecting v. USX

Precedential or Non-Precedential:

Docket 00-3105

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Allied Erecting v. USX" (2001). *2001 Decisions.* Paper 85.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/85

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 23, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-3064 and 00-3105

ALLIED ERECTING & DISMANTLING, CO., INC.,

BRANDENBURG INDUSTRIAL SERVICE COMPANY ,
(Intervener in D.C.)

v.

USX CORPORATION

       Allied Erecting & Dismantling Co.,
       Inc., Appellant No. 00-3064

ALLIED ERECTING & DISMANTLING, CO., INC.;

BRANDENBURG INDUSTRIAL SERVICE COMPANY ,
Intervener

v.

USX CORPORATION,
       Appellant No. 00-3105

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(D.C. No. 93-cv-00575)
District Judge: The Honorable Gustave Diamond

Argued September 11, 2000

BEFORE: NYGAARD, ROTH, and GARTH, Cir cuit Judges.

(Filed: April 23, 2001)

Christopher R. Opalinski, Esq.
 (Argued)
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
 Attorney for Appellant/
Cross Appellee

J. Michael Jarboe, Esq. (Argued)
USX Corporation
600 Grant Street
Room 1501, USX Tower
Pittsburgh, PA 15219
 Attorney for Appellee/
Cross Appellant

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Previous litigation between appellant, Allied Erecting and Dismantling, Co., Inc., and appellee, USX Corporation, was settled on the eve of trial. In this suit, Allied claims that USX violated several provisions of that settlement agreement. The District Court granted summary judgment in favor of USX, and Allied appeals. Many facts are contested, but we have isolated those that are germane to the three issues reaching us on appeal. As fully explained below, we will reverse the District Court's judgment in two respects, affirm the balance, and remand the cause to the District Court.

I. BACKGROUND

On the eve of trial for the first action brought by Allied against USX Corporation, the two entities entered into a court-supervised Settlement Agreement. Allied claimed that it suffered sixty-six million dollars in damages as a result of contracts it entered into with USX to dismantle several of USX's steelmaking facilities. The Settlement Agreement, which is at the heart of this controversy, provided: 1) USX would pay Allied eight million dollars; 2) Allied would be

2

granted all dismantling projects at USX's Fairless Works plant; 3) Allied could bid in good faith as a primary bidder on USX's subsequent dismantling projects; 4) Allied would be granted "last look" rights for a period of seven years to equal or better the most acceptable bid received by USX for any dismantling projects; 5) Allied would be awarded dismantling contracts at USX's Ambridge Works, Saxonburg Works, and McDonald Works.

1. Allied's Section V Claim

Allied's first two claims arise from Section V of the Settlement Agreement, which reads:

> Except as to any dismantling work at USX's South Works facility in Chicago, Illinois, Allied shall be invited to bid in good faith as one of U.S. Steel Gr oups' primary bidders on any dismantling work, of whatever nature or type at any steelmaking facilities, or former steelmaking facilities, owned by the U.S. Steel Gr oup consistent with and pursuant to specification and performance standards developed and issued by U.S. Steel Group for such work and, for a period of seven (7) years from the date of this Settlement Agr eement and General Release, Allied shall be offer ed an opportunity to equal and/or to better the most acceptable bid received by the U.S. Steel Group for any such further dismantling activity. If, within ten (10) days of r eceipt of bids, Allied offers in writing to per form such work on such terms which are equal to or better than the bid otherwise most acceptable to the U.S. Steel Gr oup, then, in such event, the work shall be awarded to Allied, provided, however, that Allied is then able to meet U.S. Steel Group performance standards then in effect and, further, that Allied has not been adjudicated to be in default under any dismantling contract with U.S. Steel Group then in effect at the time of such bidding.

Under this "last look" provision, USX issued Allied and other dismantlers specifications for projects up for bid. The third parties then bid on the projects subject to the condition that "Purchaser [USX] r eserves the right to reject

3

any or all bids." No third party was told that Allied held the right to review and match their final bids. For the first few sessions, Allied formulated and submitted ear nest bids on the projects. Formulating a bid for pr ojects such as these can be cost and labor intensive, and Allied later determined that instead of participating in the bidding pr ocess it would merely review the best bid offer ed to USX and decide if it wanted to take the job at that price.

Allied claims that USX violated the terms of Section V through its relationship with Allied's ar ch-rival, Brandenburg Industrial Services Company, Inc. Because the litigation soured Allied and USX's working relationship, USX awarded most of its dismantling projects thereafter to Brandenburg. As a result of this close working relationship, Brandenburg prepared most of the specifications for the projects on which Allied held the "last look" right. Because Brandenburg prepared these specifications, Allied argued, it held an "unquestioned and substantial advantage over the other bidders for this work." Within one bid, Brandenburg offered to forgive $379,500 that USX owed for developing the project specifications if USX granted the project to Brandenburg. Allied was unable to compete with an offer that included debt forgiveness, and ther efore claims that such dealings between USX and Brandenburg materially varied the terms of the project specifications and violated Allied's last look rights.

2. Allied's Fraudulent Inducement Claim

Allied next claims that it was fraudulently induced into accepting Section V of the Settlement Agreement. Allied claims that USX stated during the settlement bar gaining process that USX would be preparing the specifications for the projects on which Allied would bid pursuant to Section V. This statement led Allied to believe that its last look rights would not be undercut by a competitor who prepared the specifications and could therefor e offer a discount by including the price of the preparations in the bid. At the time USX allegedly made these statements to Allied, USX had already retained Brandenburg to prepare specifications for two of the projects on which Allied intended to bid.

4

Brandenburg subsequently used this leverage to outbid
Allied on one of the projects.

3. Allied's Saxonburg Claim

Allied expected to quickly raze the Saxonbur g Works
plant, liquidate its materials for a substantial pr ofit, and
thereby recoup some of its losses associated with the
litigation. Section IV of the Settlement Agr eement reads, in
part:

> 1) That all dismantling by Allied shall be per formed at
> no cost to USX;
>
> 2) That the dismantling specification will not include
> the provision for . . . any environmental remediation
> (including any remediation and/or removal of asbestos)
> by Allied, it being understood and agreed that any . . .
> environmental remediation shall be for USX's account;
>
> 3) All ferrous and non-ferrous scrap pr oduced at the
> dismantling projects shall belong to Allied.

The project, however, became complicated by a steel
manufacturing byproduct known as "sinter dust."
According to Allied,

> work in and around the dust was far mor e difficult
> than anticipated because . . . [the sinter dust] impacted
> the way facilities were dropped, the dust had to be
> cleaned from the scrap generated during the
> dismantling before the scrap could be dismantled and
> processed, and, when the dust was dry it became
> airborne and impacted visibility, [and] while it was wet,
> it congealed into a soupy mush that significantly
> slowed the work.

In addition to the general difficulties Allied experienced in
dismantling a plant full of beams, girders, and equipment
caked with the dust, Allied discovered that some of the dust
contained lead and therefore posed health risks to its
employees working amidst more than 16,000 tons of the
material. Allied notified USX of the hazar d and reminded
USX of the relevant terms governing the Saxonburg work:

5

> If during the course of the demolition project an
> environmental condition is discovered that requires
> remediation, other than asbestos, the contractor shall
> notify the purchaser and the purchaser shall be
> responsible for any necessary remediation. The
> contractor shall not be entitled to any additional
> compensation resulting from any delays due to the
> remediation process.

To protect its workers, Allied outfitted them with
protective clothing, respirators, and decontamination
showers. The cost of these safety measures diminished
Allied's anticipated profit, and the cumbersome gear
rendered the workers less productive. USX instructed Allied
to remove the lead infected dust surrounding the sinter
machines, and Allied loaded and hauled the dust to an off-
site hazardous dump. USX paid Allied for this service.
Allied also offered to load and haul the remaining sinter
dust for $4 per ton. USX agreed to the price and ultimately
paid Allied to move 16,438 tons of the non-leaded dust to
a dump site.

Allied, however, claims that it perfor med remedial work
beyond and distinct from "loading and hauling." Allied
contends that Section IV of the Settlement Agr eement
protected it from having to perfor m environmental
remediation, and thus seeks to recover"the additional
unanticipated costs it incurred in remediating the
Saxonburg facility of this sinter dust in the form of delay
and disruption damages."

II. DISCUSSION

A. The Enforceability of Section V

The District Court "declared [Section V] a nullity and
unenforceable as against public policy as practiced to date."
Allied contends that Section V does not offend the common
law consensus and therefore cannot be voided as against
public policy. We agree.

"It has long been settled," the District Court stated, "that
a court will not become an aid in the enforcement of

6

contractual provisions where to do so would violate public policy." The Court recited 19th and early 20th century caselaw, beginning with Veazy v. Allen , 66 N.E. 103, 173 N.Y. 359 (1903):

> There are . . . phases of public policy which are as enduring and immutable as the law of gravity. One of them is that, as applied to the law of contracts, courts of justice will never recognize or uphold any transaction which in its object, operation, or tendency is calculated to be prejudicial to the public welfare. That sound morality and civic honesty are cornerstones of the social edifice is a truism which needs no reinforcement by argument. It may therefore be taken for granted that whenever our courts ar e called upon to scrutinize a contract which is clearly repugnant to sound morality and civic honesty, they need not look for a well fitting definition of public policy, nor hesitate in its practical application in the law on contracts.

"The rule is," the Court continued as it cited the Pennsylvania Supreme Court in Kuhn v. Buhl , 96 A. 977, 984 (1916), "that courts having in their view public interests, will not lend their aid to the enfor cement of an unlawful contract." The Court drew its dir ect authority from Pittsburgh Dredging and Constr. Co. v. Monongahela and Western Dredging Co., 139 F . 780, 784 (Circuit Court, W.D.Pa. 1905), which stated that "[v]iewed from that standpoint of morals, square dealing, and commercial integrity, combinations for collusive, misleading, biddings, wherever made, cannot be approved; yet to enforce rights based on an agreement to make such bids is to make the law an active agent to accomplish such deceptive purposes."

> Regarding Section V of the settlement Agr eement, the Court found that the evil tendency of the contract was or would be to perpetrate a fraud on the thir d-party bidders and to deny one bidder on each project the natural consequence of the bidder's endeavors . . . This potential fraud has been and would continue to be perpetrated on innocent third parties by using the court and the confidentiality of the settlement

7

agreement to keep this practice undisclosed as to both the victims and the public. The injury to competition may not be immediate in any particular project, but if this arrangement were to be carried into ef fect repetitively, over the seven-year period, it is clear that it would have an injurious effect on competition by denying certain of those third parties what should otherwise have been awarded to them for their honest work and labor in formulating the bids.

Stating that Section V "contains the tendency to work fraud on the innocent third party bidders, repugnantly distorts the natural consequences of bona fide competition, and uses the court to shelter this state of affairs from detection," the Court held that the "pr ovision is, indeed, void as against public policy." Further, the Court refused to shift the blame for the illegality of Section V to USX because Allied could have genuinely participated in the bidding process and demanded that USX disclose Allied's last look right to the other bidders. The Court was unwilling to find that Allied was victimized by this pr ovision because it concluded that Allied chose not to participate in the bidding process on several of the projects, unfairly benefited from having others shoulder the expense of drafting the specifications, and unscrupulously viewed the bids of its rivals without their consent. The Court also refused to allow its supervisory approval of the Settlement Agreement to validate Section V, concluding that it was Allied's failure to genuinely participate in the bidding and inform other bidders of its last look rights that rendered it infirm.

When ruling on the grounds of pubic policy, a court must speak for a "virtual unanimity" that can "be found in definite indications in the law." Muschany v. United States, 324 U.S. 49, 451 (1945); Mamlin v. Genoe, 340 Pa. 320, 17 A.2d 407 (1941). We cannot find such a consensus. To the contrary, the state of the law on this issue is entirely unclear, as "last look" and "first r efusal" rights are typically found unproblematic in a variety of contexts. See Crivelli v. General Motors Corp., 215 F.3d 386 (3r d Cir. 2000) (permitting right of first refusal for automobile franchisor); Transmission Access Policy Group v. Federal Energy

8

Regulatory Comm'n, 225 F.3d 667 (D.C. Cir . 2000) (permitting right of first refusal for utilities costumers); Handelsman v. Bedford Village Assocs., 213 F.3d 48 (2d Cir. 2000) (permitting right of first refusal granted to real estate partnership pursuant to settlement agr eement); Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc., 204 F.3d 867 (9th Cir. 2000); U.S. v. Cochran, 109 F.3d 660 (10th Cir. 1997) (finding the failur e to disclose last look in securities bidding not fraudulent); Castle Rock Cellular of Oregon v. Castle Rock Cellular of Oregon, 76 F.3d 1003 (9th Cir. 1996) (finding implied covenant of good faith violated by agreement to purchase shell company in attempt to avoid first refusal provisions of partnership agreement); Pincus v. Pabst Brewing Co., 893 F .2d 1544 (7th Cir. 1990); Schultze v. Chevron Oil Co., 579 F .2d 776 (3d Cir. 1978); CBS, Inc. v. Capital Cities Comm., 301 Pa. Super . 557, 448 A.2d 48 (1982); Sun Oil Co. of Pa. v. Bellone , 292 Pa. Super. 341, 437 A.2d 415 (1981). Considering the wide acceptance of last look rights, the District Court's policy analysis contradicts common law consensus and is ther efore unsupportable. In addition, Section V was an element of the court-supervised agreement to settle the pr evious litigation. The principles of this agreement were met with approval by the trial judge presiding over that litigation, and this authorization further militates against the argument that there exist a virtual anonymity against last-look rights.

The District Court's reliance on Pittsbur gh Dredging was misplaced. In that case, the plaintiff and defendant both were bidders on a dredging project let by a non-party. See Pittsburgh Dredging, 139 F. at 780. The two bidders agreed to submit bids within a few cents of one another and to split the work regardless of which bidder received the contract. See id. at 781. The company letting the project, which was not informed of this arrangement, r ejected both bids. One bidder then submitted a new bid and r eceived the dredging project, but did not shar e the work. See id. The other bidder sued to enforce the sharing agr eement, but the District Court found it void as against public policy, holding that "combinations for collusive, misleading biddings, wherever made, cannot be approved." Id. at 784.

9

Pittsburgh Dredging is distinguishable from the instant case, which involves not an agreement between two bidders without notice to the company letting the pr oject, but rather an agreement between the party letting the project and one bidder. There was no collusive or misleading bidding. The bidding process remained competitive in that every bidder made its best bid and USX expressly reserved to itself the unfettered right and discr etion to select the "most acceptable" bid from the most acceptable bidder and to reject any and all bids for any reason. Although Allied did perhaps have some advantage by being able to match the best bid, it by no means was guaranteed the pr oject over other bidders. Unlike the agreement in Pittsburgh Dredging, Section V does not involve collusive price fixing by bidders and therefore does not pr ovide a basis for rejection as against public policy.

The District Court loosely referred to antitrust principles in its opinion, and Allied argues on appeal that because Section V constitutes neither a per se nor a rule of reason violation of the Sherman Act, it cannot violate public policy. Allied relies primarily on Sitkin Smelting & Refining Co. v. FMC Corp., 575 F.2d 440 (3d Cir. 1978).

Because we have already held that, irrespective of the Sherman Act, Section V does not violate general principles of public policy, we need not discuss Allied's Sher man Act argument. We note in passing, however , that we do not believe that Section V violates the Sherman Act. We ruled in Sitkin, a case involving a similar last look right exercised by a dismantling company, that the parties "desir ed to find the market price rather than influence the market price," and that, therefore, the contract did not violate the Sherman Act. Sitkin, 575 F.2d at 447. We believe that Allied and USX had similar intentions in drafting Section V , and, therefore, we are confident that there has been no Sherman Act violation.

In sum, we conclude that the District Court err ed by finding Section V unenforceable as contrary to public policy. We will remand for the District Court to determine if USX must pay damages to Allied for breach of contractual obligations under Section V.

10

B. Fraudulent Inducement

The fraudulent inducement claim contains thr ee sub-
issues. First, does Nocito v. Lanuitti, 402 Pa. 288, 167 A.2d
262 (1961), provide the controlling standard or was Nocito
subsequently modified by Tilghman v. Dollenberg, 418 Pa.
604, 213 A.2d 324 (1965)? Second, if Nocito requires
parties to return consideration in or der to bring their
fraudulent inducement claim, then is Allied entitled to an
exception to this rule akin to that affor ded in Greenan v.
Ernst, 393 Pa. 321, 143 A.2d 32 (1957)? Third, is Allied's
fraudulent inducement claim barred because the
statements made by USX prior to formalizing the
Settlement Agreement pertain to future pr omises and thus
are not actionable under a theory of fraudulent
inducement?

Following the Pennsylvania Supreme Court's decision in
Nocito, the District Court held that to maintain an action
for fraud based on the Settlement Agreement, Allied "must
either elect to `disaffirm the contract and offer to return . . .
the consideration for [the] release or to affirm the voidable
contract and waive the fraud.' " Nocito , 402 Pa. at 289.
Allied did not return the consideration. The District Court
therefore considered Allied's failur e to tender all
consideration it received under the Settlement Agreement
an affirmation of the contract and a waiver of its fraudulent
inducement claim. We agree.

Allied argues, however, that the rule set out in Nocito was
sharpened by the Pennsylvania Supreme Court four years
later in Tilghman v. Dollenberg. Regarding the allegedly
fraudulent sale of stocks, Tilghman stated:

> A party who has been induced by fraud to pur chase
> stock may, if he does so promptly, rescind the contract
> and sue for the entire purchase price of the stock.
> Where, however, [as] is in the instant case, the plaintiff
> does not rescind the contract but elects to stand on it,
> he may not recover the entire purchase price, but only
> the difference between the real value of the property
> purchased at the time of the sale and what was paid
> for it . . . The affirmance of a contract induced by fraud
> of the seller does not extinguish the right of the

11

> purchaser, and is not a waiver of the fraud, nor does it
> bar the right of the purchaser to recover damages for
> the fraud.

418 Pa. at 610, 213 A.2d at 326-27. According to this more recent ruling by Pennsylvania's highest court, Allied argues that affirmation of a contract only bars a party from rescinding the contract and does not pr eclude it from pursuing its allegation of fraud. Although this interpretation appears to be at odds with Nocito, Allied claims it merely clarifies the rule by distinguishing attempts to rescind fraudulent contracts fr om attempts to enforce them. Allied argues that because it does not seek to rescind the Settlement Agreement, it has not waived its fraudulent inducement claim by failing to retur n the consideration it received. We ar e not convinced.

As Tilghman indicates, a party can affirm a contract over a period of time without waiving a claim to fraudulent inducement. The affirmance will, however , bar rescission of the contract. See Emery v. Third Nat'l Bank of Pittsburgh, 314 Pa. 544, 548, 171 A. 881, 883 (1934) ("An affirmance of the contract by the vendee, with such knowledge, merely extinguishes his right to rescind the sale. His other remedies remain unimpaired. The vendor can never complain that the vendee has not rescinded."); Miller v. Central Trust & Savings Co., 285 Pa. 472, 486, 132 A. 579, 585 (1926) ("Affirmance of the contract is not a waiver of the fraud; nor does it bar the right to recover; it does bar a subsequent rescission.").

Not rescinding a contract and failing to r eturn consideration are distinct legal matters fr om the affirmance issue addressed in Tilghman, and, as Nocito indicates, failing to return consideration does waive the right to pursue a fraudulent inducement claim. Thus, a party can affirm a contract and perform according to its terms for a period of time, but once fraudulent inducement is alleged the party must either return consideration or abandon the claim. See Dempsey v. Associated Aviation Underwriters, 141 F.R.D. 248 (E.D.Pa. 1992), af f 'd, 977 F.2d 567 (3d Cir.1992); Hess v. Evans, 288 Pa. Super. 180, 181, 431 A.2d 347, 348 (1981) (stating that "plaintif fs cannot proceed in this matter by alleging that the r elease was

12

obtained as the result of fraud and misr epresentation and at the same time retain the consideration that was paid to them"). Allied attempts to conflate the per mission Tilghman grants to parties to pursue fraudulent inducement claims even if they have at some point affirmed the contract with the distinct proposition that a party needs only to return consideration if it wishes to rescind the contract through the fraudulent inducement claim. Affirming a contract at some point in its history is not the equivalent of not seeking to rescind a contract in light of a fraudulent inducement claim.

Alternatively, Allied claims that if parties are required to return consideration in order to bring fraudulent inducement claims, then it is entitled to an exception under Greenan v. Ernst, 393 Pa. 321, 143 A.2d 32 (1957). The Greenan Court allowed a party in an "insecure financial condition" to retain the consideration while maintaining a claim for fraudulent inducement. There is a considerable difference, the Greenan Court wrote, between "cases seeking to set aside a conveyance of real estate or the sale of a business and the present case in which plaintiff seeks an accounting which may find the defendant owing her additional funds." 393 Pa. at 321, 143 A.2d at 32. Greenan, therefore, provides a rare exception in an equitable proceeding where the refund of consideration was merely a matter of accounting.

The District Court refused Allied's request for two reasons. First, Allied failed to demonstrate that it was in an "insecure financial condition." Second, the District Court considered the situation in Greenan , where returning consideration would prohibit the plaintif f from "maintaining herself and pursuing an action," to be distinct from Allied's predicament. We agree with the District court. Although Allied's arguments reasonably demonstrate that returning consideration would be difficult and perhaps imprudent, it would not leave Allied in the "insecurefinancial condition" required by Greenan. W e are bound by Pennsylvania law, and although returning consideration may cause Allied a substantial difficulty, it has not established that it would cause it to fall into an insecure financial condition.

13

In conclusion, the District Court properly granted USX's motion for summary judgment on Allied's fraudulent inducement claim. Thus, we need not reach USX's argument that Allied's fraudulent inducement claim is barred because the statements made by USX befor e formalizing the Settlement Agreement pertain to future promises. In the event Allied does retur n consideration and continues to press its fraudulent inducement claim, the District Court will address USX's contention.

C. The Saxonburg Claim

Section IV of the Settlement Agreement states, in part, "that the dismantling specification will not include the provision for . . . any environmental r emediation (including any remediation and/or removal of asbestos) by Allied, it being understood and agreed that any . . . environmental remediation shall be for USX's account . . . ." The terms governing the dismantling of the Saxonbur g Plant specifically provide that if "during the course of the demolition project an environmental condition is discovered that requires remediation, other than asbestos, . . . [then] the purchaser shall be responsible for any necessary remediation."

Allied argues that any "handling" of the sinter dust should be considered a form of envir onmental remediation. Although USX paid Allied to load and haul the dust, Allied argues that it should be paid for the distinct service of vacuuming, cleaning, and otherwise removing the dust from the materials at the plant. Allied thus seeks to r ecover "the additional unanticipated costs it incurred in r emediating the Saxonburg facility of this sinter dust . .." Allied argues that the District Court improperly granted summary judgment against it on this claim because ther e is a genuine issue of material fact as to whether Allied performed environmental remediation beyond the loading and hauling for which it was paid. We agr ee.

As we have held, "the fundamental object in interpreting a contract is to ascertain the intent of the parties." Compass Tech., Inc. v. Tseng Labs., Inc. , 71 F.3d 1125, 1131 (3d Cir. 1995); see also Fineman v. Armstrong World

14

Indus., Inc., 980 F.2d 171, 215–216 (3d Cir. 1992) (stating that the task of the court "must be to interpr et the language of the settlement agreement in accor dance with the intention of the parties at the time of contracting"). If the parties' "intent can be cleanly extracted fr om the clear and unambiguous words that the parties have used, it is equally conventional wisdom that they are held to those words contained in the contract." Compass Tech., 71 F.3d 1125. If, however, the meaning of contractual terms is not transparent, then the "clear waters become murkier." Id.

If the contractual terms are facially ambiguous, then "the court should hear the evidence presented by both parties and then decide whether there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differ ent meanings." Id. (citations omitted). In making this determination, the court "must consider the words of the contract, the alternative meaning proffered by the challenging party, and the nature of the evidence that party could provide." Id. at 1132. "If the contract as a whole is susceptible to more than one reading, the fact finder resolves the matter," but if "it is unambiguous and can be interpreted only one way, the court interprets the contract as a matter of law." Pacitti v. Macy's, 193 F.3d 766, 773 (3d Cir . 1999).

Not surprisingly, the intended meanings of the ter ms "environmental remediation" and"loading and hauling" are entirely disputed by the parties. As we have held, "[s]ummary judgment may be granted based on the interpretation of a contract only if the contract is so clear that it can be read only one way." Battaglia v. McKendry, 233 F.3d 720, 721 (3d Cir. 2000) (citations omitted). We must therefore determine if Allied's work with the dust, beyond and distinct from its loading and hauling, could reasonably be considered to be a for m of environmental remediation.

The language of the contracting documents pr ovides little assistance in defining the terms "envir onmental remediation" or "loading and hauling." The contracts do not indicate what type of work will constitute envir onmental remediation, nor do they define what types of materials can be remedied. The relevant language simply states that "any

15

environmental remediation (including any r emediation and/or removal of asbestos)" will be paid by USX. The parenthetical clause provides a small clue into the intended meaning of the term remediation, since the statement that "remediation and/or removal of asbestos" will be paid by USX could reasonably be interpreted to distinguish between remediation and removal. This could r easonably be found to imply that remediation is not simply r emoval, but rather entails other work required to remedy the situation. Although this language provides only scant support for Allied's position, it is more convincing than USX's circular arguments that claim, for example, that "[s]ince Allied could not show that it performed any envir onmental remediation at Saxonburg, its remediation claim could not survive." By considering common and industry uses of these disputed terms, however, we can gain a mor e secure interpretive foothold.

The first question is whether sinter dust is the type of material that could reasonably requir e environmental remediation. As Allied correctly asserts, sinter dust is considered a form of residual waste under the Pennsylvania Solid Waste Management Act. This tells us little, however, because the Act defines residual waste as "any garbage, refuse, or other discarded material or waste resulting from industrial operations . . . provided that it is not hazardous." 35 P.S. S 6018.103. Under this definition, any harmless industrial byproduct could be considered r esidual waste, and surely all such benign materials do not r equire environmental remediation.

Allied also makes the following argument: 1) asbestos is identified as requiring environmental r emediation in Section IV; 2) both asbestos and sinter dust are classified as residual waste under the Pennsylvania Solid W aste Management Act; 3) USX agreed to pay Allied to handle and remove asbestos; therefore 4) USX should pay Allied for all costs incurred as a result of handling and removing sinter dust. Such an argument commits fallacies of equivocation and undistributed middle.1

_____

1. The argument can be restated to demonstrate its fallacies:

Allied was not required to take any precautions to control the sinter dust's movement in the environment, nor was it required to obtain any sort of permit or authorization to execute the dismantling project. Allied did, however, institute safety precautions for its workers in accordance with OSHA regulations. Further, Allied was not permitted to backfill the dust on the Saxonburg site, which suggests that sinter dust merits special environmental consideration. Instead, the unleaded sinter dust was ultimately deposited in an approved and regulated landfill, and this distinguishes it from ordinary nontoxic waste. In light of these considerations, we believe that sinter dust could reasonably be considered a material that required environmental remediation.

The second question is whether Allied's activities of cleaning the beams, equipment, and other materials of the sinter dust, as distinguished from loading and hauling,

_____

     1. X belongs to category Z.

     2. Y belongs to category Z.

     2.a. X is the same as Y (implicit sub-conclusion)

     3. A contracted the removal of X

     4. A contracted the removal of Y

Informally, such an argument presents an example of equivocation. From this we can distill the following syllogism:

     1. All X are Z

     2. All Y are Z

     3. All Y are X

This presents a formal fallacy of the undistributed middle, since Z, the middle term, is not distributed in either the minor or the major premise. The same error is committed in the following argument:

     1. All women are humans

     2. All men are humans

     3. All women are men

See generally RUGGERO ALDISERT, LOGIC FOR LAWYERS (1997).

could be considered environmental remediation. According to the Pennsylvania Land Recycling and Environmental Remediation Act of 1995, actions undertaken to "clean-up, mitigate, correct, abate, minimize, eliminate, control or prevent a release of a regulated substance into the environment in order to protect the present or future public health, safety, welfare or the environment" are considered forms of environmental remediation. 35 P.S. S 6026.103. Allied's removal of sinter dust from the Saxonburg Plant's structures could reasonably be considered a necessary step in the process of "cleaning-up," "controlling," and "correcting" the problem.

The question of whether the process of removing the dust from the raw materials constitutes a remedial activity distinct from the remedial activity of loading and hauling, however, is more difficult. Although removing the dust from the material facilitates the job of loading and hauling the dust, it is unclear that simply moving the dust from the beams or equipment on its way to be gathered for removal itself constitutes remedial work. By removing the dust from the equipment Allied could reasonably be considered to have performed an important service that prepared the dust to be properly disposed of.

A reasonable distinction between "loading and hauling" the dust and cleaning and otherwise removing the dust from the structures in the plant can be supported by the common usage of the terms. If, by analogy, a friend asked you to help her "load and haul" her belongings from one apartment to another, you might reasonably presume that such a job entailed carrying boxes and furniture from the apartment to a truck. You might also reasonably presume that you were not expected to clean her belongings, organize them, and place them in boxes. It is not plainly evident that agreeing to load and haul materials necessarily entails a commitment to prepare them for transport. Two reasonable interpretations can be defended, and therefore the terms are ambiguous. Because Allied's handling of the dust in preparation for loading and hauling the dust may well be characterized as remedial work, there is a genuine issue of material fact that precludes summary judgment. See Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001 (3d Cir. 1980).

18

Beyond the four corners of the contract and the plain meaning of the terms, the broader context of the agreements also does not give the phrases "environmental remediation" or "loading and hauling" definitive meanings. First, in divining both whether the parties may have intended "environmental remediation" to encompass the handling, vacuuming, and cleaning of the dust and whether USX's payment for Allied's loading and hauling the dust included handling and cleaning costs, we remain mindful of the circumstances under which this contract ar ose. Allied was awarded this contract to recover losses in accordance with the Settlement Agreement, and ther efore the project was intended to be a lucrative undertaking for Allied. To this end, the parties contracted for Allied to r eap all of the profits from the job and for USX to absorb all costs associated with environmental impediments. Any environmental conditions that detract fr om Allied's anticipated profits, therefore, can reasonably be considered to breach the general spirit of the contract. Allied's claim that it should not bear the cost of any envir onmental work is not without basis.

Second, in the process of negotiating the ter ms under which Allied would load and haul the dust, Allied made clear in a letter to USX dated September 1, 1993, that its fee did not encompass cleaning: "This price does not include pre-cleaning of the building by hand or vacuum removal of dusts, if required AED can perform pre-cleaning on a T&M basis utilizing AED schedule of equipment r ental rates and manpower charging rates attached." USX accepted unit price but did not comment on the disclaimer. Although it did not reply to this clarification, USX was clearly on notice of Allied's intentions. Allied's understanding that environmental remediation was to be construed as a broad term was also articulated in an affidavit by its President, John Ramun:

> In connection with the negotiation of the Settlement Agreement and in particular what later became Section IV(B)(2), I advised USX that in order to ensur e the profitability of the proposed pr ojects (including Saxonburg) Allied was agreeing to per form, USX's obligation with regard to `envir onmental remediation'

19

covered any material that required special testing, handling, treatment, storage, or disposal. Allied intended to use mass demolition techniques in its`one step' process to dismantle the buildings and facilities, process the scrap and grade the remainingfill material. Any material requiring special testing, handling, treatment, storage or disposal would adversely impact our ability to efficiently generate this scrap.

"Summary judgment may be granted based on the interpretation of a contract only if the contract is so clear that it can be read only one way." Battaglia, 233 F.3d at 721. The meaning of the terms central to Allied's Saxonburg claim present a genuine issue of material fact, and therefore we must reverse on this issue.

D. Delay Damages

Allied's delay damages are precluded by Section 21.1 of the Saxonburg Contract, which provides:

> If during the course of the demolition project an environmental condition is discovered that requires remediation, other than asbestos, the contractor shall notify the purchaser and the purchaser shall be responsible for any necessary remediation. The contractor shall not be entitled to any additional compensation resulting from any delays due to the remediation process.

If it is determined that the work beyond loading and hauling the dust does indeed constitute envir onmental remediation, then USX must pay appropriate damages. Such payment would effectively fulfill its r esponsibility for such remediation, and any damages beyond thatfinding are barred by the plain language of Section 21.1.

E. USX's Counterclaims

Because we are reversing the District Court's conclusion that Section V of the Settlement Agreement is unenforceable, we will reinstate only USX's counterclaims that were dismissed as a direct result of the District Court's enforceability ruling. In light of our holding that Section V

20

is not void as against public policy, the District Court must now address USX's counterclaim that Allied breached Section V by failing to submit initial bids on certain projects.

III. CONCLUSION

In conclusion, we will reverse and remand the Section V and Saxonburg issues to the District Court, affirm the District Court's order granting summary judgment on the fraudulent inducement claim, and reinstate USX's relevant counterclaims.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

21