

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-26-2002

# Winters v. Kutrip

Precedential or Non-Precedential: Non-Precedential

Docket No. 01-3751

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Winters v. Kutrip" (2002). *2002 Decisions.* Paper 616.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/616

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 01-3751


SUSAN F. WINTERS
Appellant


v.


WALTER J. KUTRIP, As Director Pension & Investment Savings;
PHILADELPHIA NEWSPAPERS INC.; MARYAGNES FRANGIPANNI PATEL,
As Administratrix of the Estate of Ronald Patel Deceased, and in her own right;
DECHERT, formerly known as Dechert, Price & Rhoads;
JENNIFER R. CLARKE, Esq.; THE INVESTMENT SAVINGS PLAN FOR
EMPLOYEES OF KNIGHT-RIDDER, INC. AND CERTAIN SUBSIDIARIES
OF KNIGHT-RIDDER, INC.; GARY L. BORGER, Esq.


On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 01-cv-001723)
District Judge:  Honorable Clarence C. Newcomer


Argued June 28, 2002

BEFORE:  AMBRO, STAPLETON and CUDAHY,* Circuit Judges,

(Opinion Filed: September 26, 2002)

_____

* Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit,
  sitting by designation.

C. George Milner, III (Argued)
924 Cherry Street
Suite 400
Philadelphia, PA 19107
  Attorney for Appellant

M. Frances Ryan (Argued)
Matthew L. Wiener
Dechert, Price & Rhoads
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA  19103
  Attorneys for Appellees Walter J. Kutrip,
  Philadelphia Newspapers Inc., Dechert,
  Jennifer R. Clarke, The Investment Savings Plan for
  Employees of Knight-Ridder, Inc. and Certain
  Subsidiaries of Knight-Ridder, Inc.

George A. Bochetto
Stephen E. Skovron

Bochetto & Lentz
1524 Locust Street
Philadelphia, PA  19102
   Attorneys for Appellee Maryagnes F. Patel, As
   Administratrix of the Estate of Ronald Patel,
   Deceased, and in her own right

Jeffrey B. McCarron
Schwartz, Campbell & Detweiler
1601 Market Street - 34th Floor
Philadelphia, PA  19103
   Attorney for Appellee Gary L. Borger

OPINION OF THE COURT

STAPLETON, Circuit Judge:

I.

Appellant, Susan Winters, brought this suit seeking recovery of money allegedly owed to her by the estate of her late and ex-husband, Ron Patel.  She sought recovery of these monies from not only Patel's estate, but also his 401(k) plan, its administrator,  Philadelphia Newspaper Inc. ("PNI"), the law firm and individual attorney that represented PNI in a privacy lawsuit brought by Winters, Patel's wife at his death, and her own divorce attorney.

Winters was married to the late Ron Patel until early 1999.  During their marriage Patel was an editor for The Philadelphia Inquirer, a newspaper owed by appellee PNI, and was a participant in a 401(k) plan sponsored by Knight-Ridder, Inc., PNI's parent ("Plan").  While the two were married, Winters was the beneficiary of Patel's 401(k) account.

In March 1997, Patel told Winters that he was having an affair with Mary Frangipanni and that he wanted a divorce.  The Philadelphia Daily News, a newspaper PNI also owned, published an article about Patel's relationship with Frangipanni. Winters then sued PNI for invasion of privacy in the Philadelphia Court of Common Pleas.  Appellee Dechert, a Philadelphia law firm ("Dechert"),  represented PNI in that suit, and appellee Jennifer Clarke, a partner at the Dechert firm, served as lead counsel. Winters was represented throughout the invasion of privacy litigation by the firm of Sprague & Sprague.

Patel and Winters began divorce proceedings in March 1997.  Winters was represented by Gary Borger in these proceedings.  Borger requested information from PNI about obtaining a Qualified Domestic Relations Order ("QDRO").  Appellee Walter J. Kutrip, the Director of Pension and Investment Retirement Savings Plans at Knight-Ridder Inc. and the Plan Administrator, sent Borger Knight-Ridder's policies and procedures in connection with drafting a QDRO and offered his assistance in drafting such an order.

The divorce action concluded on January 7, 1999 with a settlement and the entry of a Judgment of Divorce and Stipulation of Settlement ("the Consent Decree"). The consent decree provides, in relevant part:

It is further agreed and ordered as follows:
1.  Ronald Patel shall pay to Susan F. Winters the following sums of money, which payments shall not be taxable to Susan F. Winters:

A. $13,000.00 on or before 1/30/99;
B.  10,000.00 on or before 1/30/2000;
C.  20,000.00 on or before 1/30/2001;
D. $100,000 on or before 6/1/2007.

2.  Ronald Patel shall provide security for the payment set forth in paragraph number one hereinabove as follows:

. . .

B.  The payment of $10,000.00, due on or before 1/30/2000 shall be secured by the interest of Ronald Patel in the Knight-Ridder Inc. Investment Savings 401(k) Plan, pursuant to Plan rules and regulations.

C. The payment of $20,000.00, due on or before 1/30/2001, shall be secured by Ronald Patel's Knight-Ridder, Inc. stock options exercisable in 2000.  Ronald Patel shall give Susan F. Winters prior notice of the exercise date and make payment upon his receipt of the proceeds from the exercise of said stock options.

D.  The payment of $100,000.00, due on or before 6/1/2007, shall be secured by Ronald Patel's interest in the Knight-Ridder Inc. Investment Savings 401(k) Plan, pursuant to Plan rules and regulations.

E.  Ronald Patel shall not borrow, withdraw, or reduce the balance of his interest in the Knight-Ridder Inc. Investment Savings 401(k) Plan below the amount set forth herein until Ronald Patel's obligation to Susan F. Winters under this stipulation of settlement are paid in full.

(1)$100,000.00 minimum account balance (net of loan(s)) until 1/1/2001.

(2)$130,000.00 minimum account balance (net of loan(s)) after 1/1/2001 until Susan F. Winters is paid in full.

3.  Ronald Patel shall provide and pay for a policy of insurance on his life, naming Susan Winters the beneficiary in an amount sufficient to satisfy the remaining balance due pursuant to paragraph one of this Stipulation and Settlement.

. . .

18.  . . . Ronald Patel hereby waives any claim which he may have to seek consolidation of the Pennsylvania litigation with this matter or to assert the defense of the New Jersey Entire Controversy Doctrine in this action.

Patel and Frangipanni married in March 1999.  Patel then named Frangipanni as his beneficiary under the Plan.  On January 7, 2000, Patel died.  One month later, on February 7, 2000, the Plan honored Frangipanni's request that Patel's 401(k) benefits be paid to her.  On February 24, 2000, over thirteen months after the Consent Decree was entered, Borger wrote to Kutrip, as Plan Administrator, submitting a copy of the Consent Decree and inquiring whether Patel's 401(k) funds had been disbursed.  On March 30th, Kutrip responded advising "that Mr. Patel's interest in the Investment Savings Plan does not, and did not ever, serve as security for any amount due Ms. Winters from Mr. Patel."  App. 363.

In May of 2000, the invasion of privacy action settled.  The integrated Settlement Agreement contained mutual general releases which released "all, and all manner of, claims actions and causes of action, suits, . . . claims and demands whatsoever whether arising in law or equity, in contract or tort, including but not limited to, all claim set forth or which could have been set forth arising from or with respect to ... Susan

Winters v. Philadelphia Newspapers, Inc., et al., [and several newspaper columns] ..., whether known or unknown against Releasees from the beginning of the world to the date of these presents." App. 134.

## II.

Count I of Winters' complaint purports to state a claim against the Plan for benefits. It seeks a declaratory judgment that the Consent Decree is a QDRO and a judgment directing the Plan to pay Winters $130,000. Count II purports to state a claim against the Plan, Kutrip, PNI, Dechert and Clarke for breach of fiduciary duties imposed by ERISA. The breaches are alleged to be those defendants' concealment from Winters, prior to her execution of the general release, of the facts that the Plan had bypassed the ERISA mandate procedures relating to QDROs and had paid Patel's 401(k) funds to Frangipanni. Count III purports to state a contract claim against Patel's estate based on the Consent Decree. Counts IV, V and VI are state law claims against Dechert, Clarke, PNI, Kutrip and Frangipanni for intentional interference with contract, "Common law fraud", and "Fraud in the inducement." The remaining counts assert state law claims against Frangipanni individually and malpractice claims against Borger.

The District Court held that the Consent Decree was not a QDRO and dismissed Counts I and II on that ground as well as upon the ground that the purported claims were covered by the general release. It also dismissed Counts IV through VI as barred by the general release. Finally, the District Court refused to exercise supplemental jurisdiction over the remaining claims against the Patel estate, Frangipanni, and Borger, dismissing them without prejudice.

Winters' initial brief on appeal attacks the judgment of the District Court on three grounds: (1) The District Court erred in giving effect to the general release because it was "procured . . . through fraudulent misrepresentation and ERISA violations," (2) the District Court erred in giving effect to the general release "because Patel specifically waived the right to consolidate the divorce and privacy matter" and, accordingly, the scope of the release is limited to the claims at issue in the privacy matter, and (3) the District Court erred in concluding that the Consent Decree was not a QDRO. Those are the only issues properly before us. Federal Rule of Appellant Procedure 28. We will address each in turn.

## III.

The District Court clearly did not err in holding that the state law claims asserted in Counts IV, V and VI were claims existing at the time of the execution of the general release and were barred by the unambiguous terms of that release. Accepting as true Winters' allegations that the Agreement settling the invasion of privacy litigation was fraudulently induced, she may have had the right at one time to tender the undisclosed amount received by her in the settlement and rescind that agreement. But she has not offered, and is not now offering, to return what she received as a result of that settlement. As the District Court held, under Pennsylvania law, she may not simultaneously affirm and reject the settlement. See, e.g., Allied Erecting & Dismantling Co. v. USX Corp., 249 F.3d 191, 200 (3d Cir. 2001) (explaining and applying the rule of Nocito v. Lanuitti, 167 A.2d 262 (1961)).

## IV.

We simply do not find it material that Patel in the divorce settlement waived any right he may have had to consolidate the divorce and invasion of privacy proceedings.

## V.

Like the District Court, we conclude that the Consent Decree was not a QDRO and that the failure to advise Winters of Frangipanni's withdrawal of Patel's 401(k) monies involved no breach of fiduciary duty.

### A.

ERISA has an anti-alienation provision which, with one narrow exception, precludes the assignment of a participant's interest in a covered plan. That narrow exception is a QDRO. See 29 U.S.C. 1056(d)(3)(A).

A QDRO is a domestic relations order that "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under the plan. . . ." 29 U.S.C. 1056(d)(3)(B)(i). While ERISA preemption provision is expansive, QDROs are not preempted by ERISA. Thus, if a plan is directed by a QDRO to transfer 401(k) monies to an alternate payee, the plan violates ERISA if it does not pay the

alternate payee in accordance with the QDRO.  On the other hand, in the absence of a QDRO, a plan violates ERISA if it transfers funds to anyone other than the participant or his designated beneficiary.

A domestic relations order is a QDRO "only if such order clearly specifies":

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

29 U.S.C.  1056(d)(3)(C).

Because a QDRO creates or recognizes a right to receive only benefits to which the participant is entitled under the terms of the plan, an order can be a QDRO "only if such order . . . does not require the plan to provide any type or form of benefit, or any option, not otherwise provided under the plan.  29 U.S.C.  1056(d)(3)(D).

Receipt of a domestic relations order by a plan imposes on it a number of duties in addition to the obligation to honor the order if it turns out to be a QDRO. Section 1056(d)(3)(G)(i) of ERISA provides:

In the case of any domestic relations order received by a plan

(I) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and

(II) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

Moreover, "during any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined," up to a maximum of 18 months, the plan must segregate any amounts that become payable to the alternate payee under the order.  29 U.S.C.  1056(d)(3)(H).

Thus, "[o]nce the pension plan is on notice that a domestic relations order has issued that may be a QDRO," the plan must put the required process in motion and maintain the status quo.  Trustees of Directors Guild of America v. Tise, 234 F.3d 415, 421 (9th Cir. 2000) (emphasis supplied).  The converse is true by necessary implication: if a plan is not on notice that a domestic relations order has been entered that may be a QDRO, it is not relieved of its duty to meet its obligations to a participant and its beneficiary as those obligations become due under the terms of the plan.

B.

The Consent Decree purports to create a right to receive a payment from the Plan if Patel fails to pay $10,000 on or before January 30, 2000, and $100,000 on or before June 1, 2007.  That "security interest" is not a benefit or a portion of a benefit due Patel under the terms of the Plan.  This is persuasively demonstrated by the fact that the Plan could not have honored that interest consistent with its obligations under the Plan. Patel died on January 7, 2000.  At that time neither of the purportedly secured obligations had become due and it was impossible to tell whether the precondition of the Plan's obligation to pay anything would be satisfied.  Thus, honoring the Consent Decree would have required the Plan to hold and administer his account for seven and one-half years after his death, something it had not committed itself to do.  Moreover, on Patel's death the designated beneficiary became entitled to the account balance under the terms of the

Plan and the Plan was not at liberty to wait seven and one-half years to determine whether there would be a default.

It necessarily follows that the Consent Decree did not clearly specify a benefit which Patel had under the Plan. Under 1056(d)(3)(B), (C), and (D), this means that the Consent Decree was not a QDRO. It also means that none of the defendants named in Count II had a fiduciary duty to advise Winters of Frangipanni's withdrawal.

C.

As we have noted, ERISA imposes certain duties on the Plan following its receipt of a domestic relations order that may, but turns out not to be, a QDRO. Contrary to Winters' suggestion, however, we conclude that those duties do not arise where, as here, the benefit that is the purported subject of the order has been paid to another in accordance with the terms of the Plan prior to receipt of the domestic relations order.

Winters' complaint contains detailed allegations regarding the communications engaged in on her behalf with the Plan administrator. Her attorney sought and received advice in 1997 about drafting a QDRO. His next contact with the administrator was on February 24, 2000, when he provided Kutrip with a copy of the Consent Degree. This was over thirteen months after the Consent Order was entered, a month and one-half after Patel's death, and two weeks after the Plan paid Frangipanni in accordance with the terms of the Plan.

Winters does not claim that she or anyone else acting on her behalf gave the Plan notice of the Consent Decree prior to February 24, 2000. She claims only that she provided a copy of the Consent Decree to the defendants in the invasion of privacy suit in response to damage discovery prior to Frangipanni's withdrawal and that appellees, PNI, Dechert and Clarke, therefore, had knowledge of its existence and content prior to that withdrawal. But none of these defendants had any responsibility for the administration of the Plan and we know of no legal basis for imputing their knowledge to the Plan. They were opposing Winters in her invasion of privacy lawsuit and received the document solely for the purposes of defending that suit. They obviously owed her no duty to perfect any wholly unrelated claim she may have had against the Plan even if they had had some reason to believe she had not already submitted the Consent Decree to the Plan on her own behalf.

Winters nevertheless insists that the Plan had a duty on February 24, 2000, when it received the Consent Decree, to initiate a process of giving notice and determining whether the Consent Decree was a QDRO. This is important from her perspective because it is the sole basis for her contention that the Plan and Kutrip owed her a fiduciary duty on March 30, 2000, when Kutrip wrote rejecting the QDRO claim and not mentioning Frangipanni's withdrawal. We are unpersuaded.

As we have previously pointed out, the statutory scheme is inconsistent with the notion that Congress intended to impose a duty on an ERISA plan to honor a QDRO's benefit assignment when it has paid the benefit to the participant or his beneficiary in accordance with the plan before receiving notice of the QDRO. Indeed, Winters does not contend otherwise. Yet the process which Winters claims should be obligatory following receipt of a domestic relations order at any time is pointless where, as here, the plan will have no duty to honor the benefit assignment in the event the order is ultimately deemed to be a QDRO. We are confident that Congress did not intend to require an ERISA plan which has done nothing more than honor its obligations under the terms of the plan to go through such a pointless process. And, in the absence of such a process, we perceive no basis for finding that a plan owes a fiduciary duty to an alternate payee under a domestic relations order of which it had no notice prior to disbursing the benefit at issue.

We hold that neither the Plan nor Kutrip had an ERISA created fiduciary obligation to Winters in the Spring of 2000. Since it is clear to us that PNI, Dechert and Clarke also lacked such a fiduciary obligation, we agree with the District Court's dismissal of Count II.

VI.

The judgment of the District Court will be affirmed.

———————————————————————

TO THE CLERK:

Please file the foregoing Not Precedential Opinion.


                              /s/Walter K. Stapleton
                                       Circuit Judg