**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2027
_____

WILLIAM W. SMITH;
ANGELA M. SMITH,
Appellant

v.

STECKMAN RIDGE, LP
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 3:09-cv-00268)
District Judge: Honorable Kim R. Gibson
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 9, 2014

Before:  VANASKIE, COWEN and VAN ANTWERPEN, *Circuit Judges*.

(Filed: December 18, 2014)
_____

OPINION OF THE COURT[*]
_____

_____

   [*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

VAN ANTWERPEN, *Circuit Judge*.

William and Angela Smith (the "Smiths") appeal the final order of the District Court for the Western District of Pennsylvania, dated March 27, 2014, granting summary judgment in favor of defendant Steckman Ridge, LP ("Steckman"). *Smith v. Steckman Ridge, LP*, No. CIV. 3:09–268, 2014 WL 1278120, at *11 (W.D. Pa. Mar. 27, 2014). For the reasons that follow, we affirm the District Court.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Smiths argue that Steckman's storage of natural gas under their property constitutes a *de facto* taking under Pennsylvania eminent domain law. Steckman maintains that the parties' oil and gas lease remains in full effect and permits the storage. The Smiths respond that, although the lease permits the storage of natural gas, Steckman forfeited the lease after it stopped extracting gas from the land in 2006.

The Smiths executed an oil and gas lease with Pennsylvania General Energy Corporation ("PGE"), Steckman's predecessor in interest, for 105.572 acres of property in Bedford County, Pennsylvania, on May 18, 2000. (Lease, at ¶¶ 2–3).[1] The dual purpose lease contemplated both the extraction and storage of gas for a primary term of five years. (Lease, at ¶ 1). The lease was to continue

> for as long thereafter as prescribed payments are made, or . . . operations are conducted on the Leasehold in search of or production of oil, gas, or their constituents, or for as long as a well capable of production is located on the Leasehold, or for as long as extended by any provision herein, or for as long as the Leasehold is used for the underground storage of gas.

---

[1] A full copy of the lease agreement between the parties is included in the Appendix at 140–43.

(Lease, at ¶ 3).

Under the parties' lease, the lessee—PGE, and later Steckman—was obligated to make payments to the Smiths as follows. First, prior to the commencement of production, the lessee was required to pay a delay rental of five dollars per net mineral acre per year, paid annually in advance. (Lease, at ¶ 4). After production began, the lessee was required to pay the Smiths royalties equal to one-eighth of the total revenue realized on production. (Lease, at ¶ 4(B)). In the event that a producing well was "shut-in" pursuant to Paragraph 4(D) of the lease, the lessee was required to pay the Smiths "one half (1/2 the annual delay rental until such time as production is re-established." (Lease, at ¶ 4(D)). Finally, in the event that the lease was converted from production to storage, it required the lessee to pay for the remaining estimated economically recoverable gas reserves and the annual delay rental fee. (Lease, at ¶ 7).

PGE paid all annual delay rentals as required by the lease from 2000 through 2004. *Smith v. Steckman Ridge, LP*, No. CIV. 3:09–268, 2014 WL 1278120, at *3 (W.D. Pa. Mar. 27, 2014). On April 22, 2004, PGE began operating a well—known as Well 1663—on the Smiths' property. *Id.* PGE paid the Smiths a total of $872,031.52 in royalties based on production from Well 1663. *Id.*[1] Production continued until December 6, 2006, when PGE shut-in Well 1663. *Id.* It is undisputed that, at that time, Well 1663 was capable of producing gas in paying quantities. (Apx. at 521, ¶ 17 (sworn statement of

---

[1] These payments were made during the period between June 9, 2004 and February 27, 2007. *Smith*, 2014 WL 1278120, at *3.

Ginger Funk, on behalf of Steckman); Apx. at 574 (deposition of William W. Smith); Apx. at 581 (deposition of Angela M. Smith)).

In March of 2007, PGE assigned its rights under the lease to Steckman. *Id.* On July 3, 2007, Steckman sent the Smiths a check for $345,202.65. (Apx. at 620). That amount was offered as payment for both the estimated value of the recoverable reserves at the time of conversion to storage ($344,674.79) and the annual delay rental ($527.86). (Apx. at 620). According to Steckman, the payment was made to convert the lease from production to storage in accordance with Paragraph 7 of the lease. The Smiths did not accept this payment. *Smith*, 2014 WL 1278120, at \*3. One year later—on July 3, 2008— Steckman offered another check for both the estimated value of the recoverable reserves and the annual delay rental, this time in the amount of $388,056.50. (Apx. at 215). Again, the Smiths refused the payment. *Smith*, 2014 WL 1278120, at \*3. On March 4, 2009, Steckman sent a check for $387,000.78. (Apx. at 217). This check was offered exclusively as payment for the value of the recoverable gas reserves—not the gas storage rental. *Smith*, 2014 WL 1278120, at \*3. Steckman sent a separate check for the gas storage rental in the amount of $1,583.58. (Apx. at 218). The Smiths accepted the March 4, 2009 check, *Smith*, 2014 WL 1278120, at \*3, but they rejected the rental delay payment, (Apx. at 218). Steckman offered the Smiths delay rental payments for storage from 2007 through 2012; the Smiths never accepted any of these payments. *Smith*, 2014 WL 1278120, at \*3.

The Smiths filed a petition in the Court of Common Pleas of Bedford County, Pennsylvania, on September 3, 2009, alleging that the gas storage under the Smiths'

property constituted a *de facto* taking under Pennsylvania law because the lease had expired on March 6, 2007. Steckman properly removed the case to the Western District of Pennsylvania on October 9, 2009. Before fact discovery began, the parties filed motions for partial summary judgment regarding the validity of the lease. The District Court denied both motions to allow for discovery on the relevant issues. In July 2013, Steckman filed the summary judgment motion giving rise to this appeal. The parties presented oral argument in September 2013. The District Court granted Steckman's motion for summary judgment in a Final Order dated March 27, 2014. The Smiths timely filed this appeal on April 24, 2014.

The Smiths make five arguments on appeal. First, they argue that production "ceased" pursuant to Paragraph 12 of the lease on December 6, 2006 when PGE shut-in Well 1663. Therefore, because production did not restart within ninety days of that cessation of production, the lease expired. Second, they argue that the lease expired because Steckman did not properly make its delay rental payments under the lease's shut-in clause. Third, the Smiths argue that the lease constitutes an impermissible "no-term" lease under Pennsylvania law because it permits Steckman to indefinitely extend the lease by paying only nominal delay payments. Fourth, they argue that the lease expired when Steckman converted from production to storage without providing notice. Fifth, the Smiths argue that their acceptance of the March 4, 2009, check from Steckman does not estop them from bringing this action. For the reasons that follow, we reject each of these arguments and affirm the decision of the District Court.

## II. DISCUSSION[2]

### 1. Standard of Review

We exercise plenary review over the District Court's grant of summary judgment, viewing the facts in the light most favorable to the non-moving party. *Heffner v. Murphy*, 745 F.3d 56, 65 (3d Cir. 2014). Summary judgment is appropriate based on the interpretation of a contract where "the contract is so clear that it can be read only one way." *Allied Erecting & Dismantling v. USX Corp.*, 249 F.3d 191, 201 (3d Cir. 2001). We also review the District Court's interpretation of state law *de novo*. *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 110 (3d Cir. 2009).

### 2. Expiration of Lease Due to Cessation of Production

The Smiths first allege that the lease between the parties expired ninety days after Well 1663 was shut-in on December 6, 2006. The validity of this argument turns on whether the December 6, 2006, shut-in triggered the cessation-of-production clause in the parties' lease (Lease, at ¶ 12) or the lease's shut-in clause (Lease, at ¶ 4(D)).

#### A. Principles of Lease Interpretation

General principles of contract interpretation govern the interpretation of Pennsylvania oil and gas leases. *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012) (citing *J.K. Willison v. Consol. Coal Co.*, 637 A.2d 979, 982 (Pa. 1994)).

---

[2] The District Court had jurisdiction based on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332. We have jurisdiction to review the District Court's March 27, 2014 Final Order granting Steckman's motion for summary judgment pursuant to 28 U.S.C. § 1291.

"Determining the intention of the parties is a paramount consideration" in interpreting a lease. *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 389 (Pa. 1986) (citing *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973)). Where the terms of a lease are clear and unambiguous, the parties' intentions can be ascertained from the terms of the lease itself, as manifestly expressed within the lease's four corners. *Id.* at 389–90; *see also T.W. Phillips*, 42 A.3d at 267 ("[A lease] must be construed in accordance with the terms of the agreement as manifestly expressed."). Each of those terms should be given its plain meaning. *T.W. Phillips*, 42 A.3d at 267. However, where a portion of a lease is ambiguous, parol evidence is admissible to resolve the ambiguity. *Hutchison*, 519 A.2d at 390.

The court determines as a matter of law whether an ambiguity exists. *Id.*[3] To make this determination, we consider the words of the contract itself, the differing constructions proffered by the parties, and any objective evidence offered to support those constructions. *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir. 2001). "A contract is ambiguous if it is *reasonably* susceptible of different constructions and capable of being understood in more than one sense." *Hutchison*, 519 A.2d at 390 (emphasis added). We emphasize that only *reasonable* differing constructions can create an ambiguity. *Id.* We will not entertain baseless constructions proffered by parties, nor will we muddle or stretch the meaning of language in order to

[3] If the court finds an ambiguity, it becomes the duty of the trier of fact to resolve that ambiguity by assessing conflicting parol evidence. *Hutchinson*, 519 A.2d at 390 (citing *Easton v. Washington County Insurance Co.*, 137 A.2d 332 (Pa. 1957)). Because there is no ambiguity in the parties' lease, such an inquiry is not warranted in this case.

7

find an ambiguity. *Id.* (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)). As we conduct our review, we are mindful that summary judgment is only appropriate for an issue of contract interpretation where "the contract is so clear that it can be read only one way." *Allied Erecting & Dismantling v. USX Corp.*, 249 F.3d 191, 201 (3d Cir. 2001).

### B.    Background on Oil and Gas Lease Provisions

Before we begin our interpretation of the parties' lease, we first provide a brief overview of several standard provisions in modern oil and gas leases that are "universally recognized within the field." *Smith v. Steckman Ridge, LP*, No. CIV. 3:09–268, 2014 WL 1278120, at *5 (W.D. Pa. Mar. 27, 2014) (citing *Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 759, 764 (W.D. Pa. 2004)). These standard provisions include, *inter alia*, (1) the granting clause, (2) the habendum clause, and (3) certain savings clauses. The granting clause of an oil and gas lease specifies what interests are being conveyed to the lessee. Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law* § 665 (LexisNexis Matthew Bender 2013) [hereinafter *Williams & Meyers, Oil and Gas Law*].[4] The parties' lease gives Steckman the rights to both produce and store hydrocarbon—making it a dual purpose lease. (Lease, at ¶ 1).

---

[4] As the District Court noted, "*William and Meyers, Oil and Gas Law,* along with its *Manual of Oil and Gas Terms,* is arguably the foremost authoritative treatise on the law relating to oil and gas." *Smith*, 2014 WL 1278120, at *11 n.5. The United States Supreme Court has relied on *Williams & Meyers* to determine the meaning of terms used in the oil and gas context. *See, e.g.*, *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 208 (1989) (relying on *Williams & Meyers* for the meaning of an infill well); *C.I.R. v. Engle*, 464 U.S. 206, 209 n.4 (1984) (relying on *Williams & Meyers* for the meaning of a lease bonus payment). Pennsylvania courts also frequently cite *Williams & Meyers*. *See, e.g.*,

The habendum clause of an oil and gas lease sets forth the term of the lease. A typical habendum clause sets forth both a primary and secondary term. *Williams & Meyers, Oil and Gas Law* § 603. The primary term typically covers a fixed period of time, while the secondary term is usually indefinite and continues only where certain conditions are present. *Id.* The lease at issue has a primary term of five years, which commenced on May 18, 2000. (Lease, at ¶ 3). It also has a secondary term that extends the lease "for as long thereafter as" (1) "prescribed payments are made," (2) operations are conducted in search of production of oil, gas, or their constituents, (3) "a well capable of production is located on the Leasehold," (4) otherwise extended by other provisions of the lease, or (5) the Leasehold is used for the storage of gas. (Lease, at ¶ 3).

Most modern oil and gas leases also contain one or more savings clauses. Savings clauses serve to extend the lease when the terms of the habendum clause are not satisfied. Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law, Oil and Gas Law Scope* (LexisNexis Matthew Bender 2013) [hereinafter *Williams & Meyers, Manual of Oil and Gas Terms*] (defining "savings clause"). Two common examples of savings clauses are cessation-of-production clauses and shut-in clauses. A cessation-of-production clause is a "lease clause providing that under certain circumstances a lease may be preserved despite cessation of production in the primary or secondary term." *Williams & Meyers, Manual of Oil and Gas Terms* (defining "cessation-of-production clause"). The parties' lease has a cessation-of-production clause for both the primary and

---

*Kilmer v. Elexco Land Servs., Inc.*, 990 A.2d 1147, 1157 (Pa. 2010) (citing *Williams & Meyers* for the definition of the term royalty); *Syzmanowski v. Brace*, 987 A.2d 717, 724 (Pa. Super. Ct. 2009) (citing *Williams & Meyers* for the definition of overriding royalty).

9

secondary terms of the lease. Relevant to this case is the secondary term cessation-of-

production clause, which states in pertinent part:

> If, after the expiration of the primary term of this lease, production of oil, gas or condensate . . . should cease, this lease shall not terminate, provided that Lessee commences operations for drilling, reworking, plugging back or deepening a well within ninety (90) days from such cessation.

(Lease, at ¶ 12).

> Another type of savings clause is a shut-in clause, or a

> lease clause which authorizes a lessee to pay a shut-in gas well royalty and thereby keep a lease alive without actual production when and if a well has been drilled which is capable of producing gas in paying quantities but which is shut-in, usually by reason of lack of a market.

*Williams & Meyers, Manual of Oil and Gas Terms* (defining "shut-in clause"). In

addition to its cessation-of-production savings clause, the lease in question also has a

shut-in clause, which states:

> In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of six months, and there is no producing well on the Leasehold . . ., and the lease is not otherwise held in force by any of the provisions herein, Lessee shall pay a shut-in payment equal in amount to one half (1/2) the annual delay rental until such time as production is re-established and said payment shall maintain this lease in full force and effect to the same extent as payment of royalty.

(Lease, at ¶ 4(D)).

C.      *Interpreting the Parties' Lease*

With this background in mind, we must determine whether the cessation-of-

production and shut-in clauses of the parties' lease are ambiguous. The parties advance

conflicting interpretations of these two clauses. The Smiths argue that the cessation-of-

production clause applies where a producer *voluntarily* ceases production. (Appellant

10

Brief at 15). They then contend that the shut-in clause applies where production ceases due to forces beyond the producer's control. *Id.* Steckman argues the exact opposite— that the cessation-of-production clause applies to *in*voluntary stoppages in production and the shut-in clause applies to voluntary interruptions of production. (Appellee Brief at 17– 18). For the reasons that follow, we agree with Steckman's proposed construction of these two clauses and determine that no ambiguity exists. We therefore interpret the contract based on the plain meaning of the terms expressed therein. It is our view that there is only one way to read both the cessation-of-production and shut-in clauses.

### i.    The Cessation-of-Production Clause

We first determine whether the cessation-of-production clause applies to voluntary or involuntary halts in production. To aid our decision making, we consider the contract itself, the meanings suggested by the parties, and any objective evidence offered to support those suggestions. *Bohler-Uddeholm*, 247 F.3d at 93. In addition to providing an explanation of the cessation-of-production *clause*, Williams & Meyers also defines "cessation of production." *Williams & Meyers, Manual of Oil and Gas Terms* (defining "cessation of production"). A cessation of production is a stoppage in production "due to mechanical breakdowns, clogging of the hole, reworking operations, governmental orders or exhaustion of the deposit." *Id.* The causes of a stoppage set forth in this definition are involuntary in nature. For example, a producer does not elect to have a mechanical breakdown, a clogged hole, or an exhausted deposit.

Persuasive case law from other jurisdictions and the language of the contract itself are consistent with this definition. First, several courts have held that production has

11

"ceased" for purposes of the cessation-of-production clause only where a well becomes incapable of production. For example, the Supreme Court of Oklahoma has held that "the express provisions of the cessation-of-production clause . . . are intended to come into play in the event that *production* from the well shall cease, i.e. the well becomes incapable of producing in paying quantities." *Pack v. Santa Fe Minerals*, 869 P.2d 323, 328 (Okla. 1994). The Supreme Court of Texas has similarly held that "the cessation-of-production clause only applies if a well holding the lease ceases to be *capable of producing gas*." *Anadarko Petroleum Corp. v. Thompson*, 94 S.W. 3d 550, 556 (Tex. 2002).

The language of the contract itself also helps establish that the cessation-of-production clause is triggered by an involuntary stop in production. The cessation-of-production clause in the parties' lease states that the lease will not expire if the "Lessee commences operations for drilling, reworking, plugging back or deepening a well within ninety (90) days from such cessation." (Lease, at ¶ 12). A well-known commentator on oil and gas law has weighed in on the meaning of this language:

> The fact that the event which is designed to prevent termination is the commencement of drilling or reworking operations gives some indication of the purpose of the clause and the intention of the parties. It indicates that the parties are concerned with a situation where cessation of production is of the type that is remedied by drilling or reworking operations. Thus, the parties must have intended that the clause would become operative if a dry well is drilled *or if a producing well ceases to be capable of producing in paying quantities*.

2 Eugene O. Kuntz, *A Treatise on the Law of Oil & Gas* § 26.13, at 416–17 (1989) (emphasis added). Thus, substantial authority—authoritative secondary sources, persuasive case law, and the contract itself—supports the meaning offered by Steckman.

In contrast, there is no authority to support the Smiths' suggestion that the cessation-of-production clause only applies to voluntary halts in production. We therefore conclude that the cessation-of-production clause applies to involuntary stoppages of production that occur where a well becomes incapable of production.

## ii.    *The Shut-In Clause*

We next determine whether the shut-in clause applies to voluntary or involuntary stoppages in production. After considering the contract, the parties' suggested meanings of the clause, and persuasive authority, we conclude that the shut-in clause applies where a stoppage in production is voluntary. *Williams & Meyers* states that the purpose of a shut-in provision is to "keep a lease alive without actual production when and if a well has been drilled *which is capable of producing gas in paying quantities* but which is shut-in, *usually by reason of lack of a market*." *Williams & Meyers, Manual of Oil and Gas Terms* (emphasis added) (defining "shut-in clause"). Three aspects of this definition are of particular importance. First, the definition states that the purpose of a shut-in clause is to continue the life of a lease without actual production. *Id.* Second, the definition clarifies that the shut-in provision applies when a producer shuts in a well *that is capable of producing gas. Id.* Third and finally, the definition explains that this type of shut-in usually occurs because of a lack of market. *Id.*

The combination of these three aspects evince that the shut-in provision applies when a producer *voluntarily* stops producing gas from a functioning well. Usually, the producer makes this decision because there is not a ready (or sufficiently lucrative) market for the oil or gas. *See Pack v. Santa Fe Minerals*, 869 P.2d 323, 325–26 (Okla.

13

1994) (describing a shut-in situation where lessee producers elected to overproduce wells in the winter months where prices were significantly higher and underproduce the wells—thereby shutting them in—during the summer months when prices were lower).

The language of the lease itself also establishes that the shut-in clause applies to voluntary interruptions in production. First, the lease describes a shut-in as a situation where production is "interrupted and not marketed." (Lease, at ¶ 4(D)). Hence, the lease expressly contemplates that a producer shuts in a well when it *elects* not to produce or market oil or gas. Further, the event that prevents termination under the shut-in clause is the payment of a delay fee. (*See id.* ("[In the event of a shut-in,] Lessee shall pay a shut-in payment equal in amount to one half (1/2) the annual delay rental until such time as production is re-established . . .")). This is in stark contrast to the cessation-of-production clause, under which the lease terminates unless the producer recommences drilling or reworking operations. Thus, substantial authority again supports the meaning offered by Steckman, while there is no authority to support the Smiths' proffered interpretation of the shut-in clause.[5] We therefore conclude that the shut-in clause applies where a

---

[5] The Smiths briefly argue that the use of the word "interrupted" in the shut-in clause compels a finding that the clause applies to involuntary halts in production because the word interrupted is "commonly understood to mean stopped by forces beyond the producer's control." (Appellant Brief at 14). This argument lacks merit. First, the authority relied on by the Smiths is inapposite. *See Allied Erecting & Dismantling Co., Inc. v. USX Corp.*, 249 F.3d 191 (3d Cir. 2001) (not using the word "interrupt" once in the entire opinion). Further, the Smiths' reading of the word "interrupt" conflicts with the word's plain meaning. *See, e.g.*, *Definition of Interrupt*, Merriam-Webster Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/interrupt (listing this sample use of the word: "We *interrupt* this program to bring you a special announcement.").

producer elects to temporarily cease producing oil or gas from a functioning well—typically because of market conditions.

To summarize, our review has established that the cessation-of-production clause applies to situations where production stops because a well has somehow become incapable of production. The shut-in clause, on the other hand, applies where a producer voluntarily elects to temporarily suspend production. The parties agree that Well 1663 was shut-in on December 6, 2006. (Apx. at 521, ¶ 17; 574; 581). They also agree that the well was capable of production on that date. (*Id.*) Therefore, it is evident that the shut-in clause—and not the cessation-of-production clause—was implicated when production from Well 1663 ceased on December 6, 2006.

3.      *Satisfaction of the Shut-In Clause*

Having determined that the shut-in clause is the applicable clause in this situation, we must next determine whether Steckman satisfied the terms of that clause. We hold that it did. For the shut-in clause to operate to keep the lease in effect, the lessee—Steckman—must make the "shut-in payment" within forty-five days of the end of any six-month period during which no production took place. (Lease, at ¶ 4(D)). The "shut-in payment" equals "one half (1/2) the annual delay rental." *Id.* Therefore, Steckman was required to pay $263.93 by July 21, 2007 to satisfy the terms of the lease.[6] The parties

---

[6] The six-month shut-in period, starting December 6, 2006 lapsed on June 6, 2007. Steckman was required to pay within 45 days of this lapse—by July 21, 2007. The annual delay rental is $5.00 per net mineral acre. (Lease, at ¶ 4(A)). The lease conveys an interest in 105.572 acres. (Lease, at ¶ 2). Thus, the total annual delay rental is $527.86 ($5.00 x 105.572). One half of that amount is $263.93.

agree that Steckman tendered a payment of $345,202.65 to the Smiths on July 3, 2007. (Apx. at 526, 620). However, the Smiths argue that the proffered payment was insufficient to continue the lease in force because the payment was not "annually in advance" as required by the shut-in clause. That is, the payment offered did not include the six months after the well was closed on December 6, 2006, until payment was proffered on July 3, 2007. For the following reasons, this argument is invalid.

Pennsylvania law discourages forfeiture. *McCausland v. Wagner*, 78 A.3d 1093, 1102 (Pa. Super. Ct. 2013) ("We observe it is an oft-stated maxim that the law abhors a forfeiture." (citation omitted)). Indeed, forfeiture of the lease would be inequitable given the expectations of the bargaining parties. *See id.* at 1105 (stating that it would "impede[] logic" for the oil and gas industry to develop a lease "that allows a lessor to declare a forfeiture for failure to make a royalty payment after a well has been completed and oil or gas is being produced"). Additionally, Pennsylvania law does not encourage forfeiture in the absence of bad faith. *T. W. Phillips Gas & Oil Co. v. Jedlicka*, 964, A.2d 13, 16 (Pa Super. Ct. 2008), *aff'd*, 42 A.3d 261 (Pa. 2012).

We believe that Steckman consistently acted with good faith. Under the shut-in clause, Steckman was only required to pay the Smiths $263.93. In lieu of that payment, they offered the Smiths $345,202.65. Because the Smiths were timely offered significantly more money than was required to keep the lease in force under the shut-in clause, there is no prejudice warranting forfeiture. Any nominal amount due under the shut-in clause was exceeded by the royalty payment for conversion to storage, notwithstanding the Smiths refusal to accept payment. Therefore, it would be inequitable

to find that Steckman's good faith payment for an amount greater than required by the shut-in clause requires a complete forfeiture of the lease. We agree with the District Court that damages are the appropriate remedy for any sums not collected from the end of extraction on December 6, 2006. Accordingly, the District Court committed no error.

To summarize, we hold that the parties' lease never expired. From the signing of the lease on May 18, 2000 until May 18, 2005, the lease was held in force under the primary term of the habendum clause. (Lease, at ¶ 3). During the period of production—from May 18, 2005 through December 6, 2006—the lease was held in force under the secondary term of the habendum clause—specifically, the provisions stating that the lease was effective "for as long thereafter as prescribed payments are made, or . . . operations are conducted on the Leasehold in search of or production of oil, gas, or their constituents." *Id.* From December 6, 2006, through July 3, 2007, the shut-in clause kept the lease effective. (Lease, at ¶ 4(D)). Finally, since July 3, 2007—when Steckman tendered the appropriate payments to convert the lease to storage—the lease has remained effective pursuant to the final provision of the habendum clause and its conversion to storage clause. (Lease, at ¶¶ 3, 7).

>   *4.      No-Term Lease*

Third, the Smiths argue that the lease constitutes a "no-term" lease under Pennsylvania law and is therefore unenforceable. Generally, a lessee may not use delay rental payments to indefinitely extend a lease after making no effort to extract reserves during the lease's primary term. *Hite v. Falcon Partners*, 13 A.3d 942, 948 n.4 (Pa. Super. Ct. 2011). The longstanding policy of delay rentals is to spur the lessee towards

17

development. *Id*. at 948. Indeed, "no-term" leases have been consistently rejected by the Pennsylvania courts from their general introduction in the 1890s. *Jacobs v. CNG Transmission Corp*, 332 F. Supp. 2d 759, 790 (W.D. Pa. 2004) (citing 2 Summers, The Law of Oil and Gas § 290). Pennsylvania law also frowns upon lease terms that enable lessees to forego extraction in favor of speculation so as to deprive the lessor of his or her bargain. *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 273 (Pa. 2012).

The Smiths rely heavily on *Hite* for their argument that the lease is an unenforceable "no-term" lease. In *Hite*, the lessors granted rights to extract for a primary term of one year, "or as Lessee shall continue to pay Lessors two dollars ($2.00) per acre as delayed rentals, or until all oil and gas has been removed from the Property, whichever shall last occur." *Id*. at 944. The lessees never attempted to extract reserves during the primary term. *Id*. After receiving annual rental payments of $2.00 per acre for the next four years without production, the lessors sought competing bids for extraction. *Id*. The *Hite* court held the lessee to have forfeited the lease by delaying production past the primary term. *Id*. at 950. In so doing, the *Hite* court recognized the utility and validity of habendum clauses to lessees, but also the competing interest of lessors, in fairness, to receive within the primary term of the lease the benefit of their bargain—royalties of extraction. *Id*. at 946–48. However, the *Hite* court also noted that the construction of the lease at issue in the case—with its lack of separate habendum and delay rental clauses— was not typical of modern oil and gas leases. *Id*. at 944 n.1.

We agree that the District Court properly distinguished *Hite*. First, *Hite* does not stand for the broad proposition that delay payments may never extend a lease after the

18

primary term. Rather, *Hite* reiterates Pennsylvania policy that a lessee cannot use a delay rental payment to extend the lease indefinitely for speculative purposes without production. Second, *Hite* did not address what effect a dual purpose lease or a shut-in clause would have upon a delay rental payments clause. We believe that *Hite* does not apply to leases where the lessor acts in good faith, extracts reserves during the primary term of the lease, and does not attempt to indefinitely preserve extraction rights without compensating the lessor for the dormant reserves in accord with habendum and shut-in clauses. *Hite*, 13 A.3d at 948–50.

Here, PGE properly paid delay rental payments until extraction began during the primary term of the lease. During the period of extraction, PGE paid the Smiths $872,031.52 in royalty payments. After taking over the lease, Steckman offered the Smiths over $300,000 for the viable dormant reserves after production stopped, as required by the shut-in clause. Therefore, the delay payments during the secondary term of the lease were not indefinite, but temporary. In other words, Steckman did not indefinitely extend the lease so as to deprive the Smiths of any benefit of their bargain. Effectively, the Smiths argue that *any* delay payment after the primary term of the lease has expired transforms the lease into a prohibited "no-term" lease. This position is at odds with the facts of *Hite*, as well as the policy prohibiting no-term leases. Thus, the District Court committed no error in holding the lease valid.

6.      *Lack of Notice of Conversion*

Similar to its "no-term" lease argument, the Smiths argue that Steckman forfeited the lease for failure to provide adequate notice of the conversion from production to

19

storage. This argument is also without merit. The plain terms of the lease do not require Steckman to provide notice—formal or informal—before conversion. The "Conversion to Storage" clause only requires Steckman to pay the appropriate value of the "estimated recoverable gas remaining in the well using methods of calculating gas reserves as are generally accepted by the natural gas industry, and [the Smiths] shall be paid Delay Rental for as long thereafter as the Leasehold is used for gas storage." (Lease, at ¶ 7). Steckman properly submitted payment according to this provision when it tendered the $345,202.65 payment to the Smiths on July 3, 2007. (Apx. at 620). Accordingly, the District Court committed no error holding that the lack of notice, if any, did not result in forfeiture of the lease.

7.      *Estoppel*

Finally, the Smiths argue that the District Court erred in holding them estopped from arguing forfeiture of the lease because they accepted the March 4, 2009, check for gas storage under the shut-in clause. Lessors who accept royalty payments under a lease relinquish any claim of forfeiture of the lease based upon the lessee's failure to provide payments under the lease. *McCausland v. Wagner*, 78 A.3d 1093, 1104–05 (Pa. Super. Ct. 2013). This accords with the basic principle that a party who accepts benefits from an agreement is estopped from denying the agreement's validity. 31 C.J.S. *Estoppel and Waiver* § 163 (2013); *Laurel Mobile Health Servs. Ltd. v. Com., Dep't of Health*, 550 A.2d 616, 621 (Pa. Commw. Ct. 1988). The Smiths maintain that they consistently

rejected the rental payments under the lease and only accepted the March 4, 2009, check for partial payment of royalties.[7]

The Smiths misread the holding of the District Court. On account of the receipt of the March 4, 2009, check for storage of gas reserves under the shut-in clause, the Smiths have established that the lease continued in force despite their objections to the contrary. This does not prevent the Smiths from challenging the method of reserve calculation giving rise to the March 4, 2009, payment. However, that issue was not properly raised before the District Court and is not properly before us on appeal. Because the Smiths subsequently accepted Steckman's March 4, 2009, check for stored reserves pursuant to the shut-in clause, they are estopped from denying the continuing validity of the lease. The principles of equity do not allow the Smiths to retain the March 4, 2009, payment while simultaneously arguing that Steckman forfeited the lease in 2007.

### III.    CONCLUSION

For the foregoing reasons, we affirm the decision of the District Court.

---

[7] The Smiths additionally argue that they are due *more* money for the reserves based upon alleged undervaluation of the reserves according to the doctrine of divisible strata in an oil and gas leases.

21